**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT PAHLKOTTER, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **DEMAND FOR JURY TRIAL** |
| SELECTQUOTE, INC., TIM DANKER, RYAN CLEMENT, and RAFFAELE SADUN, | |
| Defendants. | |

Plaintiff Robert Pahlkotter ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by SelectQuote, Inc. ("SelectQuote" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by SelectQuote; and (c) review of other publicly available information concerning SelectQuote.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired SelectQuote securities between September 9, 2020 and May 1, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. SelectQuote is an insurance broker which sells Medicare Advantage and other health insurance plans online and by telephone.

3. On May 1, 2025, at approximately noon eastern standard time, the U.S. Department of Justice ("DOJ") filed a False Claims Act complaint against SelectQuote, alleging, "[f]rom 2016 through *at least* 2021"[1] SelectQuote received "tens of millions of dollars" in "illegal kickbacks" from health insurance companies in exchange for steering Medicare beneficiaries to enroll in the insurers' plans. Further, SelectQuote, in exchange for kickbacks, engaged in a conspiracy with

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

major insurers to illegally discriminate against beneficiaries deemed to be less profitable, including those with disabilities. The DOJ concluded that SelectQuote made materially false claims by stating it offers "unbiased coverage comparisons" when in fact it "***repeatedly directed Medicare beneficiaries to the plans offered by insurers that paid them the most money, regardless of the quality or suitability of the insurers' plans***."

4.      On this news, SelectQuote's stock price fell $0.61, or 19.2%, to close at $2.56 per share on May 1, 2025, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company was directing Medicare beneficiaries to the plans offered by insurers that best compensated SelectQuote, regardless of the quality or suitability of the insurers' plans; (2) that SelectQuote did not provided unbiased comparison shopping for Medicare Advantage insurance plans; (3) that SelectQuote received illegal kickbacks to steer Medicare beneficiaries to certain insurers and limit enrollment in competitors' plans; (4) that as a result, SelectQuote had not complied with applicable laws, regulations, and contractual provisions; (5) that SelectQuote was vulnerable to regulatory and legal sanctions as a result of its conduct, including claims that it had violated the False Claims Act; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

10.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.    Plaintiff Robert Pahlkotter, as set forth in the accompanying certification, incorporated by reference herein, purchased SelectQuote securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.    Defendant SelectQuote is incorporated under the laws of Delaware with its principal executive offices located in Overland Park, Kansas. SelectQuote's common stock trades on the New York Stock Exchange ("NYSE") exchange under the symbol "SLQT."

13.     Defendant Tim Danker ("Danker") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14.     Defendant Ryan Clement ("Clement") has been the Company's Chief Financial Officer ("CFO") since May 2022.

15.     Defendant Raffaele Sadun ("Sadun") was the Company's CFO from 2017 until May, 2022.

16.     Defendants Danker, Clement, and Sadun (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     SelectQuote is an insurance broker which sells Medicare Advantage and other health insurance plans online and by telephone. SelectQuote reports its results in four segments: Senior, Life, Auto & Home, and starting in 2021, Healthcare Services. The Company's Senior segment purports to provide "unbiased comparison shopping for Medicare Advantage [] and

Medicare Supplement [] insurance plans" representing "approximately 15 leading, nationally-recognized insurance carrier partners, including Humana, UnitedHealthcare, and Aetna."

18.    SelectQuote went public in May, 2020, and maintains a fiscal year end on June 30th annually.

**Materially False and Misleading**

**Statements Issued During the Class Period**

19.    The Class Period begins on September 9, 2020. On that day, SelectQuote reported its financial results for the fourth quarter and full fiscal year ended June 30, 2020. The press release touted the Company alleged financial results, including an alleged 90% year over year increase in revenue, a 160% year over year increase in senior division revenue, and contributions of the Company's purported "commission" and "production bonus" revenue. Specifically, the press release stated as follows, in relevant part:

**SelectQuote, Inc. Reports Fourth Quarter 2020 and Fiscal Year 2020 Results**

**Fourth Quarter 2020 - Consolidated Earnings Highlights**

•Revenue of $141 million, Up 90% Year-Over-Year

•Net Income of $20 million, Up 56% Year-Over-Year

•Adjusted EBITDA of $40 million, Up 106% Year-Over-Year*

•Full-Year 2021 Revenue, Net Income and Adjusted EBITDA Expected to be in the Following Ranges:

∘Revenue Expected in a Range of $775 million to $815 million

∘Net Income Expected in a Range of $115 million to $127 million

∘Adjusted EBITDA Expected in a Range of $200 million to $215 million*

*                    *                    *

**Senior Division**

**Financial Results**

The following table provides the financial results for the Senior division for fourth quarter and fiscal years ended June 30:

| (in thousands) | 4Q 2020 | 4Q 2019 | % Change | FY 2020 | FY 2019 | % Change |
|---|---|---|---|---|---|---|
| Revenue | $  87,865 | $  33,799 | 160 % | $  361,673 | $  192,257 | 88 % |
| Adjusted EBITDA* | 33,387 | 12,996 | 157 % | 145,738 | 90,174 | 62 % |
| Adjusted EBITDA Margin | 38 % | 38 % | | 40 % | 47 % | |

\*                    \*                    \*

| | Three months ended June 30, | | Year Ended June 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| | (unaudited) | (unaudited) | (unaudited) | |
| REVENUE: | | | | |
| Commission | $  122,679 | $  64,998 | $  476,606 | $  296,000 |
| Production bonus and other | 18,768 | 9,401 | 54,909 | 41,469 |
| Total revenue | 141,447 | 74,399 | 531,515 | 337,469 |
| | | | | |
| OPERATING COSTS AND EXPENSES: | | | | |
| Cost of revenue | 40,911 | 24,128 | 167,399 | 104,421 |
| Marketing and advertising | 51,911 | 25,838 | 184,157 | 110,265 |
| General and administrative | 9,504 | 5,074 | 35,283 | 18,169 |
| Technical development | 3,259 | 2,094 | 12,347 | 8,326 |
| Total operating costs and expenses | 105,585 | 57,134 | 399,186 | 241,181 |
| | | | | |
| INCOME FROM OPERATIONS | 35,862 | 17,265 | 132,329 | 96,288 |
| | | | | |
| INTEREST EXPENSE, NET | (9,522) | (538) | (25,761) | (1,660) |
| OTHER EXPENSES, NET | (385) | (7) | (405) | (15) |
| INCOME BEFORE INCOME TAX EXPENSE | 25,955 | 16,720 | 106,163 | 94,613 |
| INCOME TAX EXPENSE | 5,906 | 3,834 | 25,016 | 22,034 |
| | | | | |
| NET INCOME | $  20,049 | $  12,886 | $  81,147 | $  72,579 |

20.     On September 10, 2020, the Company submitted its annual report for the fiscal year ended June 30, 2020 on a Form 10-K filed with the SEC (the "FY20 10-K"). The FY20 10-K affirmed the previously reported financial results. The FY20 10-K further reported the manner in which the Company alleged to collect and record revenue, as follows, in relevant part:

**Key Components of our Results of Operations**

*Revenue*

We earn commissions for the sale of first year and renewal policies from our insurance carrier partners, which are presented in our consolidated statements of comprehensive income as commission revenue. Additionally, we earn certain volume-based bonuses from some carriers on first-year policies sold, which we refer to as production bonuses and marketing development funds, based on

6

attaining various predetermined target sales levels or other agreed upon objectives, as presented in the consolidated statements of comprehensive income as production bonus and other revenue ("other revenue"). Our contracts with our insurance carrier partners contain a single performance obligation satisfied at the point in time to which we allocate the total transaction price. The transaction price is identified as the first year commission due upon the initial sale of a policy as well as an estimate of future renewal commissions and other revenue when applicable. After a policy is sold, we have no material additional or recurring obligations to the policyholder or the insurance carrier partner. Therefore, we do not incur any additional expense related to our receipt of future renewal commissions or other revenue. All of the costs associated with the sale of an individual policy are incurred prior to or at the time of the initial sale of an individual policy.

21.    The FY20 10-K stated the following regarding the Company's purported "business model," and products, including that the Company's "***agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer***," as follows in relevant part:

### Our Business Model

We operate in an attractive segment of the insurance value chain, distributing insurance products on behalf of our insurance carrier partners who, in return, pay us commissions. Accordingly, we do not currently generate significant revenues directly from the consumers with whom we interact. In addition, because we are not the issuer of the insurance policy to the consumer, we bear no underwriting risks.

\*                    \*                    \*

We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.

\*                    \*                    \*

### *Our Products*

The core products we distribute on behalf of our insurance carrier partners are needs-based and critical to the overall financial well-being of consumers and the protection of their most valued assets: their families, their health and their property. Increasing household financial obligations, rising healthcare costs, importance of health and well-being, and government and lender mandates for certain insurance coverage drive the need for the insurance products we distribute. These products are underwritten by leading insurance carrier partners that we carefully select across

our three segments: SelectQuote Senior, SelectQuote Life and SelectQuote Auto & Home.

SelectQuote Senior ("Senior"), our fastest growing and largest segment, was launched in 2010 and provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans as well as prescription drug plan, dental, vision and hearing, and critical illness products. We represent approximately 15 leading, nationally-recognized insurance carrier partners, including Humana, UnitedHealthcare, and Aetna. MA and MS plans accounted for 77% and 74% of our approved Senior policies for the years ended June 30, 2020 and 2019, respectively, with ancillary policies, including prescription drug and dental, vision and hearing ("DVH") plans, accounting for the majority of the remainder.

*       *       *

**We evaluate our business using the following three segments:**

SelectQuote Senior ("Senior"), our fastest growing and largest segment, was launched in 2010 and provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans as well as prescription drug plan, dental, vision and hearing, and critical illness products. We represent approximately 15 leading, nationally-recognized insurance carrier partners, including Humana, UnitedHealthcare, and Aetna. MA and MS plans accounted for 77% and 74% of our approved Senior policies for the years ended June 30, 2020 and 2019, respectively, with ancillary policies, including prescription drug and dental, vision and hearing ("DVH") plans, accounting for the majority of the remainder.

22.     The FY20 10-K stated the following regarding the Company's purported "insurance carrier partners" and the manner in which the Company alleged to receive "marketing development funds," as follows in relevant part:

*Our Insurance Carrier Partners*

We maintain longstanding, deeply integrated relationships with over 50 of the nation's leading insurance carriers, who have some of the industry's most widely recognizable brands. Our insurance carrier partners consider us a key strategic partner, as evidenced by our standing as one of the top DTC insurance distributors for a number of our key partners, including carriers owned by Humana, UnitedHealthcare, Aetna and Prudential. These high-quality relationships have resulted in strong insurance carrier retention rates and the fact that we have never been dropped by an insurance carrier partner. We believe carriers see our method of acquiring customers as scalable and efficient and, ultimately, as cost advantageous compared to their own models, and provide us, in some cases, with

marketing development funds as additional compensation to deliver policies. Marketing development funds are similar to production bonuses in that they are based on attaining various predetermined target sales levels or other agreed upon objectives for individual insurance carrier partners. Our insurance carrier partners are responsible for paying our commissions and, for these purposes, act as our customers. We do not currently generate revenues directly from the consumers to whom we sell insurance policies on behalf of our insurance carrier partners.

Separate from SelectQuote's comparison shopping platform, we have established several carrier-specific sales platform arrangements with several of our insurance carrier partners, which we call "pods". These arrangements give us access to various marketing assets from our insurance carrier partners, such as use of the insurance carrier's brand, which allows us to target customers for specific insurance carrier partners to give us access to incremental sales volume. Consumers directed to a pod agent come from either leads that are not branded as SelectQuote or come directly from an insurance carrier-affiliated channel. Our software assigns a propensity score to unbranded leads, potentially assigning those with a high propensity to purchase from a specific carrier to that carrier's pod. The number of insurance carrier partners with which we have pod relationships can vary quarter to quarter depending on the insurance carrier partner and the segment.

23.     The FY20 10-K purported to warn of the risks to the Company, including those related to compliance with law and regulation, which "***may***" or "***could***" impact the Company, as follows in relevant part:

### Risks Related to Laws and Regulation

***Laws and regulations regulating insurance activities are complex and could have a material and adverse effect on our business, may reduce our profitability and potentially limit our growth.***

The insurance industry in the United States is heavily regulated. The insurance regulatory framework addresses, among other things: granting licenses to companies and agents to transact particular business activities; and regulating trade, marketing, compensation and claims practices. For example, we are required by state regulators to maintain a valid license in each state in which we transact insurance business and comply with business practice requirements that vary from state to state. In addition, our agents who transact insurance business must also maintain valid licenses. Complying with the regulatory framework requires a meaningful dedication of management and financial resources. Due to the complexity, periodic modification and differing interpretations of insurance laws and regulations, we may not have always been, and we may not always be, in full compliance with them. There can be no assurance that we, our employees, consultants, contractors and other agents are in full compliance with current and/or future laws and regulations or interpretations. Any such non-compliance could

impose material costs on us, result in limitations on the business we conduct or damage our relationship with regulatory bodies, our insurance carrier partners and consumers, any of which could have a material and adverse effect on our business, operating results, financial condition and prospects.

*           *           *

***Our business may be harmed if we do not market Medicare plans effectively or if our website and marketing materials are not timely approved or do not comply with legal requirements.***

Our insurance carrier partners whose Medicare plans we sell approve our website, much of our marketing material and our call scripts for our Senior segment. In the event that CMS or an insurance carrier partner requires changes to, disapproves, or delays approval of these materials, we could lose a significant source of Medicare plan demand and the operations of our Senior segment could be adversely affected. If we are not successful in timely receiving insurance carrier partner or CMS approval of our marketing materials, we could be prevented from implementing our Medicare marketing initiatives, which could harm our business, operating results, financial condition and prospects, particularly if such delay or non-compliance occurs during AEP or OEP. The CMS rules and regulations also apply to our marketing partners' marketing materials. If our marketing partners' marketing materials do not comply with the CMS marketing guidelines or other Medicare program related laws, rules and regulations, such non-compliance could result in our losing the ability to receive referrals of individuals interested in purchasing Medicare plans from that marketing partner or being delayed in doing so.

24.     On August 25, 2021, SelectQuote, Inc. reported its financial results for the fourth quarter and full fiscal year ended June 30, 2021. The press release touted the Company alleged financial results, including an alleged 33% year over year increase in revenue, a 101% year over year increase in senior division revenue, and contributions of the Company's purported "commission" and "production bonus" revenue. Specifically, the press release stated as follows, in relevant part:

**SelectQuote, Inc. Reports Fourth Quarter 2021 and Fiscal Year 2021 Results**

**Fourth Quarter of Fiscal Year 2021 - Consolidated Earnings Highlights**

•Revenue of $188.4 million, Up 33% Year-Over-Year

•Net Income of $3.3 million, Down $16.7 million Year-Over-Year

•Adjusted EBITDA of $21.3 million, Down 47% Year-Over-Year*

**Fourth Quarter of Fiscal Year 2021 - Segment Highlights**

<u>Senior</u>

•Revenue of $124.4 million, Up 42% Year-Over-Year

•Adjusted EBITDA of $24.8 million, Down 26% Year-Over-Year*

•Approved Medicare Advantage policies grew 54% Year-Over-Year

*                    *                    *

Chief Financial Officer Raffaele Sadun added, "Our Senior full-year revenues grew 101% year-over-year, which follows full-year growth of 88% in fiscal 2020. New MA approved policies also grew in excess of 100% at attractive unit economics with a Revenue to CAC of 3.0x. Our MA LTV was down 2% for the year, which includes a full-year true-up in our 4th Quarter results for additional provision due to higher than expected intra-year lapse rates. Despite some persistency pressure compared to original expectations, we expect cohort-level IRRs to remain very attractive."

*                    *                    *

<u>Senior</u>

**Financial Results**

The following table provides the financial results for the Senior segment for the periods presented:

| (in thousands) | 4Q 2021 | 4Q 2020 | % Change | FY 2021 | FY 2020 | % Change |
|---|---|---|---|---|---|---|
| Revenue | $ 124,391 | $ 87,865 | 42 % | $ 728,701 | $ 361,673 | 101 % |
| Adjusted EBITDA* | 24,830 | 33,387 | (26)% | 243,777 | 145,738 | 67 % |
| Adjusted EBITDA Margin* | 20 % | 38 % | | 33 % | 40 % | |

*                    *                    *

11

|  | Three Months Ended June 30, | | Year Ended June 30, | |
|---|---|---|---|---|
|  | 2021 | 2020 | 2021 | 2020 |
| REVENUE: | | | | |
| Commission | $ 162,294 | $ 122,679 | $ 826,606 | $ 476,606 |
| Production bonus and other | 26,155 | 18,768 | 111,209 | 54,909 |
| Total revenue | 188,449 | 141,447 | 937,815 | 531,515 |
| OPERATING COSTS AND EXPENSES: | | | | |
| Cost of revenue | 64,110 | 40,911 | 270,715 | 167,399 |
| Marketing and advertising | 86,595 | 51,911 | 385,291 | 184,157 |
| General and administrative | 18,618 | 9,504 | 63,114 | 35,283 |
| Technical development | 5,165 | 3,259 | 18,623 | 12,347 |
| Total operating costs and expenses | 174,488 | 105,585 | 737,743 | 399,186 |
| INCOME FROM OPERATIONS | 13,961 | 35,862 | 200,072 | 132,329 |
| INTEREST EXPENSE, NET | (8,422) | (8,356) | (29,320) | (24,595) |
| LOSS ON EXTINGUISHMENT OF DEBT | — | (1,166) | (3,315) | (1,166) |
| OTHER EXPENSES, NET | (43) | (385) | (1,588) | (405) |
| INCOME BEFORE INCOME TAX EXPENSE | 5,496 | 25,955 | 165,849 | 106,163 |
| INCOME TAX EXPENSE | 2,184 | 5,906 | 34,803 | 25,016 |
| NET INCOME | $ 3,312 | $ 20,049 | $ 131,046 | $ 81,147 |

25.    On August 26, 2021, the Company submitted its annual report for the fiscal year ended June 30, 2021 on a Form 10-K filed with the SEC (the "FY21 10-K"). The FY21 10-K affirmed the previously reported financial results. The FY21 10-K reported the manner in which the Company alleged to collect and record revenue, as follows, in relevant part:

*Revenue*

Our primary source of revenue are the commissions earned for the sale of first year and renewal policies from our insurance carrier partners, which are presented in our consolidated statements of comprehensive income as commission revenue. Additionally, we earn certain volume-based bonuses from some carriers on first-year policies sold, which we refer to as production bonuses and marketing development funds, based on attaining various predetermined target sales levels or other agreed upon objectives, as presented in the consolidated statements of comprehensive income as production bonus and other revenue ("other revenue"). Furthermore, the production bonus and other revenue also includes the lead generation revenue from InsideResponse and the revenue generated through the Population Health platform.

Our commission contracts with our insurance carrier partners contain a single performance obligation satisfied at the point in time to which we allocate the total transaction price. The transaction price is identified as the first year commission due upon the initial sale of a policy as well as an estimate of future renewal commissions and other revenue when applicable. After a policy is sold, we have no material additional or recurring obligations to the policyholder or the insurance

carrier partner. Therefore, we do not incur any additional expense related to our receipt of future renewal commissions or other revenue. All of the costs associated with the sale of an individual policy are incurred prior to or at the time of the initial sale of an individual policy. Commission and other revenue are recognized at different milestones for each segment based on the contractual enforceable rights, our historical experience, and established customer business practices.

26.    The FY21 10-K stated the following regarding the Company's purported "business model," and products, including that the Company's "agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer," as follows in relevant part:

**Our Business Model**

We operate in an attractive segment of the insurance value chain, distributing insurance products on behalf of our insurance carrier partners who, in return, pay us commissions. Accordingly, we do not currently generate significant revenues directly from the consumers with whom we interact. In addition, because we are not the issuer of the insurance policy to the consumer, we bear no underwriting risks.

\*                    \*                    \*

We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.

\*                    \*                    \*

*Our Products*

The core products we distribute on behalf of our insurance carrier partners are needs-based and critical to the overall financial well-being of consumers and the protection of their most valued assets: their families, their health and their property. Increasing household financial obligations, rising healthcare costs, importance of health and well-being, and government and lender mandates for certain insurance coverage drive the need for the insurance products we distribute. These products are underwritten by leading insurance carrier partners that we carefully select across our three segments: SelectQuote Senior, SelectQuote Life and SelectQuote Auto & Home.

SelectQuote Senior ("Senior"), our fastest-growing and largest segment, was launched in 2010 and provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans as well as prescription drug plan, dental, vision and hearing, and critical illness products. We represent approximately 20 leading, nationally recognized insurance carrier partners, including Humana, UnitedHealthcare, and Aetna. MA and MS plans accounted for 78%, 77%, and 74% of our approved Senior policies for the years ended June 30, 2021, 2020, and 2019, respectively, with ancillary policies, including prescription drug and dental, vision and hearing ("DVH") plans, accounting for the majority of the remainder. Additionally, InsideResponse and Population Health are reported under the Senior segment.

*        *        *

**We evaluate our business using the following three segments:**

SelectQuote Senior ("Senior"), our fastest growing and largest segment, was launched in 2010 and provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans as well as prescription drug and dental, vision and hearing ("DVH") plans, and critical illness products. We represent approximately 20 leading, nationally-recognized insurance carrier partners, including Humana, UnitedHealthcare, Aetna, and Wellcare. MA and MS plans accounted for 78%, 77%, and 74% of our approved Senior policies for the years ended June 30, 2021, 2020, and 2019, respectively, with ancillary policies, including DVH plans, accounting for the majority of the remainder. Additionally, InsideResponse and Population Health are included in the Senior segment for segment reporting purposes.

27.    The FY21 10-K stated the following regarding the Company's purported insurance carrier partners and the manner in which the Company alleged to receive "marketing development funds," as follows in relevant part:

***Our Partners***

We maintain long-standing, deeply integrated relationships with over 50 of the nation's leading insurance carriers, who have some of the industry's most widely recognizable brands, including approximately 20 insurance carrier partners in our Senior segment, approximately 18 insurance carrier partners in our Life segment, and approximately 27 insurance carrier partners in our Auto & Home segment. During our most recent fiscal years, our primary insurance carrier partners in our Senior segment were carriers owned by Humana, UnitedHealthcare, Aetna, and Wellcare, the primary insurance carrier partners in our Life segment were Pacific Life and carriers owned by Prudential and Mutual of Omaha, and the primary insurance carrier partners in our Auto & Home segment were Travelers, Safeco, and Allied/Nationwide. These high-quality relationships have resulted in strong

14

insurance carrier retention rates and the fact that we have never been dropped by an insurance carrier partner. We believe carriers see our method of acquiring customers as scalable and efficient and, ultimately, as cost advantageous compared to their own models, and provide us, in some cases, with marketing development funds as additional compensation to deliver policies. Marketing development funds are similar to production bonuses in that they are based on attaining various predetermined target sales levels or other agreed-upon objectives for individual insurance carrier partners. Our insurance carrier partners are responsible for paying our commissions and, for these purposes, act as our customers. We do not currently generate significant revenues directly from the consumers to whom we sell insurance policies on behalf of our insurance carrier partners.

Separate from our comparison-shopping platform, we have established several carrier-specific sales platform arrangements with several of our insurance carrier partners, which we call "pods." These arrangements give us access to various marketing assets from our insurance carrier partners, such as use of the insurance carrier's brand, which allows us to target customers for specific insurance carrier partners to give us access to incremental sales volume. Consumers directed to a pod agent come from either leads that are not branded as SelectQuote or come directly from an insurance carrier-affiliated channel. Our software assigns a propensity score to unbranded leads, potentially assigning those with a high propensity to purchase from a specific carrier to that carrier's pod. The number of insurance carrier partners with which we have pod relationships can vary quarter to quarter depending on the insurance carrier partner and the segment.

28.     The FY21 10-K purported to warn of the risks to the Company, including those related to compliance with law and regulation, which "***may***" or "***could***" impact the Company, as follows in relevant part:

### Risks Related to Laws and Regulation

***Laws and regulations regulating insurance activities are complex and could have a material and adverse effect on our business, may reduce our profitability and potentially limit our growth.***

The insurance industry in the United States is heavily regulated. The insurance regulatory framework addresses, among other things: granting licenses to companies and agents to transact particular business activities; and regulating trade, marketing, compensation and claims practices. For example, we are required by state regulators to maintain a valid license in each state in which we transact insurance business and comply with business practice requirements that vary from state to state. In addition, our agents who transact insurance business must also maintain valid licenses. Complying with the regulatory framework requires a meaningful dedication of management and financial resources. Due to the complexity, periodic modification and differing interpretations of insurance laws

and regulations, we may not have always been, and we may not always be, in full compliance with them. There can be no assurance that we, our employees, consultants, contractors and other agents are in full compliance with current and/or future laws and regulations or interpretations. Any such non-compliance could impose material costs on us, result in limitations on the business we conduct or damage our relationship with regulatory bodies, our insurance carrier partners and consumers, any of which could have a material and adverse effect on our business, operating results, financial condition and prospects.

*    *    *

***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans could harm our business, operating results, financial condition and prospects.***

Our Senior segment is subject to a complex legal and regulatory framework and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS for Medicare Advantage and Medicare Part D prescription drug plans, change frequently. Changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.

Changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods.

*    *    *

***Our business may be harmed if we do not market Medicare plans effectively or if our website and marketing materials are not timely approved or do not comply with legal requirements.***

Our insurance carrier partners whose Medicare plans we sell approve our website, much of our marketing material and our call scripts for our Senior segment. In the event that CMS or an insurance carrier partner requires changes to, disapproves, or delays approval of these materials, we could lose a significant source of Medicare plan demand and the operations of our Senior segment could be adversely affected. If we are not successful in timely receiving insurance carrier partner or CMS approval of our marketing materials, we could be prevented from implementing our

16

Medicare marketing initiatives, which could harm our business, operating results, financial condition and prospects, particularly if such delay or non-compliance occurs during AEP or OEP. The CMS rules and regulations also apply to our marketing partners' marketing materials. If our marketing partners' marketing materials do not comply with the CMS marketing guidelines or other Medicare program related laws, rules and regulations, such non-compliance could result in our losing the ability to receive referrals of individuals interested in purchasing Medicare plans from that marketing partner or being delayed in doing so.

29.     On August 29, 2022, the Company reported its financial results for the fourth quarter and year ended June 30, 2022. The press release touted the Company alleged financial results, including its purported senior, "commission," and "production bonus" revenue. Specifically, the press release stated as follows, in relevant part:

**SelectQuote, Inc. Reports Fourth Quarter and Fiscal Year 2022 Results**

**Fourth Quarter of Fiscal Year 2022 – Consolidated Earnings Highlights**

•Revenue of $139.4 million

•Net loss of $104.7 million

•Adjusted EBITDA*of $(60.8) million

•Excluding the $(48.3) million cohort/tail adjustment, Revenue of $187.7 million*

•Excluding the $(48.3) million cohort/tail adjustment, Net loss of $56.4 million*

•Excluding the $(48.3) million cohort/tail adjustment, Adjusted EBITDA of $(12.5) million*

                *                *                *

**Fourth Quarter of Fiscal Year 2022 – Segment Highlights**

**<u>Senior</u>**

•Revenue of $97.9 million

•Adjusted EBITDA*of $(44.4) million

•Approved Medicare Advantage policies grew 39% Year-Over-Year

                *                *                *

Chief Executive Officer Tim Danker commented, "We are pleased with the progress we have made against the strategic redesign of our business. Our goal is to optimize our core senior and healthcare services businesses with a focus on improving returns and higher visibility in our projected cash flows. Now six months into our strategic redesign, we have increasing confidence and high conviction that SelectQuote will create value for shareholders in the years to come. Clearly, the responsibility to prove our value to shareholders is ours, and we can only do that through consistent execution, but our results year-to-date and in the fourth quarter demonstrate expanding profitability in both our core senior and healthcare services businesses including our growing SelectRx business."

President Bob Grant added, "The actions we have taken in preparation for the upcoming Medicare Advantage season position SelectQuote well for success against our stated strategic goals to improve unit profitability and cash flow. Our agent force will be onboarded earlier and will consist of a higher proportion of core tenured agents, which should drive improved productivity. Similarly, our plan to originate fewer policies will allow SelectQuote to focus marketing and sales on the best performing Medicare Advantage business. These strategies combined with about $250 million in cost savings identified to date and the impressive growth of our SelectRx business will help improve both the cash flow generation and predictability of our business in the upcoming season and for years ahead."

*    *    *

## Senior

## Financial Results

The following table provides the financial results for the Senior segment for the periods presented:

| (in thousands) | 4Q 2022 | 4Q 2021 | % Change | FY 2022 | FY 2021 | % Change |
|---|---|---|---|---|---|---|
| Revenue | $ 97,917 | $ 124,391 | (21)% | $ 595,375 | $ 728,701 | (18)% |
| Adjusted EBITDA* | (44,374) | 24,830 | (279)% | (193,799) | 243,777 | (179)% |
| Adjusted EBITDA Margin* | (45)% | 20 % | | (33)% | 33 % | |

*    *    *

| | Three Months Ended June 30, | | Year Ended June 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| REVENUE: | | | | |
| Commission | $ 94,809 | $ 159,107 | $ 587,518 | $ 818,772 |
| Production bonus | 12,878 | 15,395 | 89,057 | 70,653 |
| Other | 31,707 | 10,760 | 87,470 | 40,556 |
| Total revenue | 139,394 | 185,262 | 764,045 | 929,981 |
| | | | | |
| OPERATING COSTS AND EXPENSES: | | | | |
| Cost of revenue | 107,076 | 64,110 | 466,808 | 270,715 |
| Marketing and advertising | 75,080 | 86,595 | 484,084 | 385,291 |
| General and administrative | 25,267 | 18,618 | 89,837 | 63,114 |
| Technical development | 6,054 | 5,165 | 24,729 | 18,623 |
| Goodwill impairment | 44,596 | — | 44,596 | — |
| Total operating costs and expenses | 258,073 | 174,488 | 1,110,054 | 737,743 |
| | | | | |
| INCOME (LOSS) FROM OPERATIONS | (118,679) | 10,774 | (346,009) | 192,238 |
| | | | | |
| INTEREST EXPENSE, NET | (12,295) | (8,422) | (43,595) | (29,320) |
| LOSS ON EXTINGUISHMENT OF DEBT | — | — | — | (3,315) |
| OTHER EXPENSE, NET | (26) | (43) | (202) | (1,588) |
| INCOME (LOSS) BEFORE INCOME TAX EXPENSE (BENEFIT) | (131,000) | 2,309 | (389,806) | 158,015 |
| INCOME TAX EXPENSE (BENEFIT) | (26,318) | 1,513 | (92,302) | 33,156 |
| | | | | |
| NET INCOME (LOSS) | $ (104,682) | $ 796 | $ (297,504) | $ 124,859 |

30.    On August 29, 2022, the Company submitted its annual report for the fiscal year ended June 30, 2022 on a Form 10-K filed with the SEC (the "FY22 10-K"). The FY22 10-K affirmed the previously reported financial results. The FY22 10-K reported the manner in which the Company alleged to collect and record revenue, as follows, in relevant part:

### *Revenue*

Our primary source of revenue are the commissions earned for the sale of first year and renewal policies from our insurance carrier partners, which are presented in our consolidated statements of comprehensive income as commission revenue. Additionally, we earn certain volume-based bonuses from some carriers on first-year policies sold, which we refer to as both production bonuses and marketing development funds, based on attaining various predetermined target sales levels or other agreed upon objectives, as presented in the consolidated statements of comprehensive income as production bonus revenue. Other revenue includes the lead generation revenue from InsideResponse and the revenue generated through Healthcare Services.

Our commission contracts with our insurance carrier partners contain a single performance obligation satisfied at the point in time to which we allocate the total transaction price. The transaction price is identified as the first year commission due upon the initial sale of a policy as well as an estimate of future renewal commissions and production bonus revenue when applicable. After a policy is sold, we have no material additional or recurring obligations to the policyholder or the insurance carrier partner. Therefore, we do not incur any additional expense related to our receipt of future renewal commissions or production bonus revenue. All of the costs associated with the sale of an individual policy are incurred prior to or at the time of the initial sale of an individual policy. Revenue is recognized at different milestones for each segment based on the contractual enforceable rights, our historical experience, and established customer business practices. Refer to Note 1 to the consolidated financial statements for further details by segment. InsideResponse's lead generation revenue is recognized when the generated lead is accepted by our customers, which is the point of sale, and we have no performance obligation after the delivery.

31.    The FY22 10-K stated the following regarding the Company's purported "business model," and products, including that the Company's "***agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer***," as follows in relevant part:

**Our Business Model**

We operate in an attractive segment of the insurance value chain, distributing insurance products on behalf of our insurance carrier partners who, in return, pay us commissions. Accordingly, we do not currently generate significant revenues directly from the consumers with whom we interact. In addition, because we are not the issuer of the insurance policy to the consumer, we bear no underwriting risks.

*            *            *

We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.

*            *            *

**Our Products**

The core products we distribute on behalf of our insurance carrier partners are needs-based and critical to the overall financial well-being of consumers and the

protection of their most valued assets: their families, their health and their property. Increasing household financial obligations, rising healthcare costs, importance of health and well-being, and government and lender mandates for certain insurance coverage drive the need for the insurance products we distribute. These products are underwritten by leading insurance carrier partners that we carefully select across our three segments: SelectQuote Senior, SelectQuote Life and SelectQuote Auto & Home.

SelectQuote Senior ("Senior"), our largest segment, was launched in 2010 and provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans as well as prescription drug and dental, vision, and hearing ("DVH") plans, and critical illness products. We represent approximately 21 leading, nationally-recognized insurance carrier partners, including UnitedHealthcare, Wellcare, and Humana. MA and MS plans accounted for 82% of our approved Senior policies for the year ended June 30, 2022, with other ancillary type policies accounting for the remainder. Additionally, InsideResponse (our lead generation business acquired in 2020) is included in Senior for reporting purposes.

*                    *                    *

**We evaluate our business using the following three segments:**

SelectQuote Senior ("Senior"), our fastest growing and largest segment, was launched in 2010 and provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans as well as prescription drug and dental, vision, and hearing ("DVH") plans, and critical illness products. We represent approximately 21 leading, nationally-recognized insurance carrier partners, including UnitedHealthcare, Wellcare, and Humana. MA and MS plans accounted for 82%, 78%, and 77% of our approved Senior policies for the years ended June 30, 2022, 2021, and 2020, respectively, with other ancillary type policies accounting for the remainder. Additionally, InsideResponse (our lead generation business acquired in 2020) is included in Senior for segment reporting purposes.

32.    The FY22 10-K stated the following regarding the Company's purported insurance carrier partners and the manner in which the Company alleged to receive "marketing development funds," as follows in relevant part:

*Our Partners*

We maintain long-standing, deeply integrated relationships with over 50 of the nation's leading insurance carriers, who have some of the industry's most widely recognizable brands, including approximately 21 insurance carrier partners in our Senior segment, approximately 22 insurance carrier partners in our Life segment,

and approximately 22 insurance carrier partners in our Auto & Home segment. During our most recent fiscal years, our primary insurance carrier partners in our Senior segment were carriers owned by Humana, UnitedHealthcare, Aetna, and Wellcare, the primary insurance carrier partners in our Life segment were CUNA, Pacific Life, and carriers owned by Mutual of Omaha, and the primary insurance carrier partners in our Auto & Home segment were Travelers, Safeco, and Allied/Nationwide. These high-quality relationships have resulted in strong insurance carrier retention rates and the fact that we have never been dropped by an insurance carrier partner. We believe carriers see our method of acquiring customers as scalable and efficient and, ultimately, as cost advantageous compared to their own models, and provide us, in some cases, with marketing development funds as additional compensation to deliver policies. Marketing development funds are similar to production bonuses in that they are based on attaining various predetermined target sales levels or other agreed-upon objectives for individual insurance carrier partners. Our insurance carrier partners are responsible for paying our commissions and, for these purposes, act as our customers. We do not currently generate significant revenues directly from the consumers to whom we sell insurance policies on behalf of our insurance carrier partners.

Separate from our comparison-shopping platform, we have established several carrier-specific sales platform arrangements with several of our insurance carrier partners, which we call "pods." These arrangements give us access to various marketing assets from our insurance carrier partners, such as use of the insurance carrier's brand, which allows us to target customers for specific insurance carrier partners to give us access to incremental sales volume. Consumers directed to a pod agent come from either leads that are not branded as SelectQuote or come directly from an insurance carrier-affiliated channel. Our software assigns a propensity score to unbranded leads, potentially assigning those with a high propensity to purchase from a specific carrier to that carrier's pod. The number of insurance carrier partners with which we have pod relationships can vary quarter to quarter depending on the insurance carrier partner and the segment.

33.    The FY22 10-K purported to warn of the risks to the Company, including those related to compliance with law and regulation, which "***may***" or "***could***" impact the Company, as follows in relevant part:

### Risks Related to Laws and Regulation

***Laws and regulations regulating insurance activities are complex and could have a material and adverse effect on our business, reduce our profitability, and potentially limit our growth.***

The insurance industry in the United States is heavily regulated. The insurance regulatory framework addresses, among other things: granting licenses to companies and agents to transact particular business activities; and regulating trade,

marketing, compensation and claims practices. For example, we are required by
state regulators to maintain a valid license in each state in which we transact
insurance business and comply with business practice requirements that vary from
state to state. In addition, our agents who transact insurance business must also
maintain valid licenses. Complying with the regulatory framework requires a
meaningful dedication of management and financial resources. Due to the
complexity, periodic modification and differing interpretations of insurance laws
and regulations, we may not have always been, and we may not always be, in full
compliance with them. There can be no assurance that we, our employees,
consultants, contractors and other agents are in full compliance with current and/or
future laws and regulations or interpretations. Any such non-compliance could
impose material costs on us, result in limitations on the business we conduct or
damage our relationship with regulatory bodies, our insurance carrier partners and
consumers, any of which could have a material and adverse effect on our business,
operating results, financial condition and prospects.

*       *       *

***Our Senior segment is subject to a complex legal and regulatory framework, and
non-compliance with or changes in laws and regulations governing the
marketing and sale of Medicare plans and other healthcare-related products and
services could harm our business, operating results, financial condition and
prospects.***

Our Senior segment is subject to a complex legal and regulatory framework, and
the laws and regulations governing the marketing and sale of Medicare plans,
particularly with respect to regulations and guidance issued by CMS related to
Medicare Advantage and Medicare Part D prescription drug plans, change
frequently. Changes to the laws, regulations and guidelines relating to Medicare
plans, their interpretation or the manner in which they are enforced could harm our
business, operating results, financial condition and prospects.

34.    On September 13, 2023, the Company reported its financial results for the fourth

quarter and year ended June 30, 2023.  The press release touted the Company alleged financial

results, including senior division revenue and contributions of the Company's purported

"commission" revenue. Specifically, the press release stated as follows, in relevant part:

**SelectQuote, Inc. Reports Fourth Quarter of Fiscal Year 2023 Results**

**Fourth Quarter of Fiscal Year 2023 – Consolidated Earnings Highlights**

•Revenue of $221.8 million

•Net loss of $(47.8) million

•Adjusted EBITDA*of $(5.8) million

*      *      *

**Fourth Quarter Fiscal Year 2023 – Segment Highlights**

<u>Senior</u>

•Revenue of $103.6 million

•Adjusted EBITDA*of $16.1 million

•Approved Medicare Advantage policies of 110,027

*      *      *

SelectQuote Chief Executive Officer, Tim Danker, remarked, "SelectQuote completed a highly successful fiscal 2023 with another strong quarter of results across each of our businesses. In total, our full year results significantly surpassed our initial forecasts driven by both higher growth, but most importantly, with outstanding operational execution against our paramount goal to optimize profitability and cash flow. The most stark example is nearly $80 million of outperformance in full-year Adjusted EBITDA versus our initial guidance. Similarly, excluding our investment in the growth of SelectRx, the SelectQuote model would have produced positive operating cash flow for the year, which we plan to scale in the quarters and years ahead."

Mr. Danker continued, "Looking toward the future, our teams are excited to leverage our strategic redesign across each of our businesses, and we believe there is significant opportunity in our Healthcare Services segment. We can, and will, reproduce the success we have achieved in SelectRx with additional value-add services needed by seniors, healthcare providers, and our insurance carrier partners. We believe strongly that SelectQuote is unique in our ability to provide and optimize these services given the information and the leverage we can create via our role as the connective tissue between those in need and the providers of care and coverage. To say it more directly, SelectQuote is not just a Medicare Advantage distribution company, and we plan to decisively demonstrate that through our results in the coming years."

*      *      *

<u>Senior</u>

**Financial Results**

The following table provides the financial results for the Senior segment for the periods presented:

24

| (in thousands) | 4Q 2023 | 4Q 2022 | % Change | FY 2023 | FY 2022 | % Change |
|---|---|---|---|---|---|---|
| Revenue | $ 103,592 | $ 68,452 | 51 % | $ 590,131 | $ 527,907 | 12 % |
| Adjusted EBITDA* | 16,147 | (32,574) | 150 % | 155,077 | (161,702) | 196 % |
| Adjusted EBITDA Margin* | 16 % | (48)% | | 26 % | (31)% | |

\*                              \*                              \*

| | Three Months Ended June 30, | | Year Ended June 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| REVENUE: | | | | |
| Commission | $ 119,844 | $ 94,809 | $ 653,470 | $ 587,518 |
| Pharmacy | 79,905 | 27,929 | 239,547 | 59,460 |
| Other | 22,029 | 16,656 | 109,831 | 117,067 |
| Total revenue | 221,778 | 139,394 | 1,002,848 | 764,045 |
| | | | | |
| OPERATING COSTS AND EXPENSES: | | | | |
| Cost of revenue | 65,697 | 37,722 | 301,524 | 391,528 |
| Cost of goods sold—pharmacy revenue | 71,211 | 64,172 | 225,963 | 64,172 |
| Marketing and advertising | 63,521 | 75,080 | 301,245 | 484,084 |
| Selling, general, and administrative | 49,856 | 30,449 | 136,518 | 100,945 |
| Technical development | 7,154 | 6,054 | 26,015 | 24,729 |
| Goodwill impairment | — | 44,596 | — | 44,596 |
| Total operating costs and expenses | 257,439 | 258,073 | 991,265 | 1,110,054 |
| | | | | |
| INCOME (LOSS) FROM OPERATIONS | (35,661) | (118,679) | 11,583 | (346,009) |
| | | | | |
| INTEREST EXPENSE, NET | (21,721) | (12,295) | (80,606) | (43,595) |
| OTHER EXPENSE, NET | (3) | (26) | (121) | (202) |
| LOSS BEFORE INCOME TAX BENEFIT | (57,385) | (131,000) | (69,144) | (389,806) |
| INCOME TAX BENEFIT | (9,547) | (26,318) | (10,600) | (92,302) |
| | | | | |
| NET LOSS | $ (47,838) | $ (104,682) | $ (58,544) | $ (297,504) |

35.     On September 13, 2023, the Company submitted its annual report for the fiscal year ended June 30, 2023 on a Form 10-K filed with the SEC (the "FY23 10-K"). The FY23 10-K affirmed the previously reported financial results. The FY23 10-K reported the manner in which the Company alleged to collect and record revenue, including "production bonuses," as follows, in relevant part:

*Revenue*

We earn revenue in the form of commission payments from our insurance carrier customers, for the initial year the policy is in effect ("first year") and, where applicable, for each subsequent year the policy renews ("renewal year"), as presented in our consolidated statements of comprehensive income (loss) as commission revenue. After an insurance policy is sold, we have no material additional or recurring obligations to the policyholder or the insurance carrier partner. Therefore, we do not incur any additional expense related to our receipt of future renewal commissions. All of the costs associated with the sale of an

individual policy are incurred prior to or at the time of the initial sale of an individual policy.

We also receive certain volume-based bonuses from some carriers on first year policies sold based on attaining various predetermined target sales levels or other agreed upon objectives. These bonuses are referred to as "production bonuses" or "marketing development funds" and are included in other revenue in the consolidated statements of comprehensive income (loss). Pharmacy revenue includes revenue from the sale of prescription and OTC medications from SelectRx. Other revenue includes production bonuses and marketing development funds, revenue from Population Health (excluding SelectRx pharmacy revenue), and external lead generation revenue from InsideResponse.

36.    The FY23 10-K stated the following regarding the Company's purported "business model," and products, including that the Company's ***agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer***," as follows in relevant part:

**Our Business Model**

We operate in an attractive segment of the insurance value chain, distributing insurance products on behalf of our insurance carrier partners who, in return, pay us commissions. Accordingly, we do not currently generate significant revenues directly from the consumers with whom we interact. In addition, because we are not the issuer of the insurance policy to the consumer, we bear no underwriting risks.

*                    *                    *

We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.

*                    *                    *

***Our Products***

The core products we distribute on behalf of our insurance carrier partners are needs-based and critical to the overall financial well-being of consumers and the protection of their most valued assets: their families, their health and their property. Increasing household financial obligations, rising healthcare costs, importance of health and well-being, and government and lender mandates for certain insurance coverage drive the need for the insurance products we distribute. These products are underwritten by our carefully selected insurance carrier partners across our three insurance distribution segments: Senior, Life, and Auto & Home. Additionally,

through our Healthcare Services segment, we offer pharmaceutical and other healthcare-related services.

Senior was launched in 2010 and provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans as well as prescription drug and dental, vision, and hearing ("DVH") plans, and critical illness products. We represent approximately 25 leading, nationally-recognized insurance carrier partners, including UnitedHealthcare ("UHC"), Humana, and Wellcare. MA and MS plans accounted for 89% of our approved Senior policies for the year ended June 30, 2023, with other ancillary type policies accounting for the remainder.

*   *   *

We evaluate our business using the following four segments:

Senior was launched in 2010 and provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans as well as prescription drug and dental, vision, and hearing ("DVH") plans, and critical illness products. We represent approximately 25 leading, nationally-recognized insurance carrier partners, including UnitedHealthcare ("UHC"), Humana, and Wellcare. MA and MS plans accounted for 89%, 82%, and 78% of our approved Senior policies for the years ended June 30, 2023, 2022, and 2021, respectively, with other ancillary type policies accounting for the remainder.

37. The FY23 10-K stated the following regarding the Company's purported insurance carrier partners and the manner in which the Company alleged to receive "marketing development funds," as well as "production bonuses" as follows in relevant part:

### Our Partners

We maintain long-standing, deeply integrated relationships with approximately 70 of the nation's leading insurance carriers, who have some of the industry's most widely recognizable brands, including approximately 25 insurance carrier partners in our Senior segment, approximately 20 insurance carrier partners in our Life segment, and approximately 25 insurance carrier partners in our Auto & Home segment. During our most recent fiscal years, our primary insurance carrier partners in our Senior segment were carriers owned by UnitedHealthcare, Humana, WellCare, and Aetna, the primary insurance carrier partners in our Life segment were carriers owned by Mutual of Omaha, CUNA, and Pacific Life, and the primary insurance carrier partners in our Auto & Home segment were Travelers, SafeCo, and Progressive. These high-quality relationships have resulted in strong insurance carrier retention rates and the fact that we have never been dropped by an insurance carrier partner. We believe carriers see our method of acquiring customers as scalable and efficient and, ultimately, as cost advantageous compared to their own

models, and provide us, in some cases, with marketing development funds as additional compensation to deliver policies. Marketing development funds are similar to production bonuses in that they are based on attaining various predetermined target sales levels or other agreed-upon objectives for individual insurance carrier partners. Our insurance carrier partners are responsible for paying our commissions and, for these purposes, act as our customers. We do not currently generate significant revenues directly from the consumers to whom we sell insurance policies on behalf of our insurance carrier partners.

Separate from our comparison-shopping platform, we have established several carrier-specific sales platform arrangements with several of our insurance carrier partners, which we call "pods." These arrangements give us access to various marketing assets from our insurance carrier partners, such as use of the insurance carrier's brand, which allows us to target customers for specific insurance carrier partners to give us access to incremental sales volume. Consumers directed to a pod agent come from either leads that are not branded as SelectQuote or come directly from an insurance carrier-affiliated channel. The number of insurance carrier partners with which we have pod relationships can vary quarter to quarter depending on the insurance carrier partner and the segment.

38.     The FY23 10-K purported to warn of the risks to the Company, including those related to compliance with law and regulation, which "***may***" or "***could***" impact the Company, as follows in relevant part:

**Risks Related to Laws and Regulation**

***Laws and regulations regulating insurance activities are complex and could have a material and adverse effect on our business, reduce our profitability, and potentially limit our growth.***

The insurance industry in the United States is heavily regulated. The insurance regulatory framework addresses, among other things: granting licenses to companies and agents to transact particular business activities; and regulating trade, marketing, compensation and claims practices. For example, we are required by state regulators to maintain a valid license in each state in which we transact insurance business and comply with business practice requirements that vary from state to state. In addition, our agents who transact insurance business must also maintain valid licenses. Complying with the regulatory framework requires a meaningful dedication of management and financial resources. Due to the complexity, periodic modification and differing interpretations of insurance laws and regulations, we may not have always been, and we may not always be, in full compliance with them. There can be no assurance that we, our employees, consultants, contractors and other agents are in full compliance with current and/or future laws and regulations or interpretations. Any such non-compliance could impose material costs on us, result in limitations on the business we conduct or

damage our relationship with regulatory bodies, our insurance carrier partners and consumers, any of which could have a material and adverse effect on our business, operating results, financial condition and prospects.

*          *          *

***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans and other healthcare-related products and services could harm our business, operating results, financial condition and prospects.***

Our Senior segment is subject to a complex legal and regulatory framework, and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS related to Medicare Advantage and Medicare Part D prescription drug plans, change frequently. For example, in April 2023, CMS finalized rules that could increase compliance costs and otherwise impact our business results by, among other things, requiring new disclosures that could make certain forms of marketing less practicable and potentially requiring a 48-hour waiting period between initial contact with a beneficiary and enrolling that beneficiary. These and any other changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.

In addition, changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods.

39.    On September 13, 2024, the Company reported its financial results for the fourth quarter and year ended June 30, 2024. The press release touted the Company alleged financial results, including senior division revenue, and contributions of the Company's purported "commissions and other services" revenue. Specifically, the press release stated as follows, in relevant part:

**SelectQuote, Inc. Reports Fourth Quarter of Fiscal Year 2024 Results**

**Fourth Quarter of Fiscal Year 2024 – Consolidated Earnings Highlights**

•Revenue of $307.2 million

•Net loss of $31.0 million

•Adjusted EBITDA*of $14.4 million

*                         *                         *

**Fourth Quarter Fiscal Year 2024 – Segment Highlights**

<u>Senior</u>

•Revenue of $114.1 million

•Adjusted EBITDA*of $27.9 million

•Approved Medicare Advantage policies of 107,272

*                         *                         *

SelectQuote Chief Executive Officer, Tim Danker, commented, "2024 was another successful and strong year for SelectQuote across both Senior Medicare Advantage distribution and our Healthcare Services business, driven by SelectRx. On a consolidated basis our fiscal year revenue and Adjusted EBITDA outperformed the midpoint of our original forecast by 17% and 26%, respectively. This marks the 10th consecutive quarter of outperformance versus our internal expectations, reaffirming our strategy to prioritize profitability and cash efficiency over volume growth. Revenue growth was driven primarily by 68% growth in SelectRx members and increasing utilization. Our profitability was driven by another strong year of execution in Senior, which achieved a 25% Adjusted EBITDA margin, similar to a very strong fiscal 2023. Additionally, our Healthcare Services segment achieved its 5th straight quarter of profitability ending the year with Adjusted EBITDA of $7.8 million, which compares to an Adjusted EBITDA loss of $22.8 million in fiscal 2023. Lastly, SelectQuote has signed a non-binding letter of intent to complete an initial commissions receivable securitization of approximately $100 million with certain of our term lenders. Provided this deal closes in the coming weeks, we believe this will be an important first step in our strategic imperative to optimizing our balance sheet capacity, lowering our funding costs, and extending our debt maturities."

Mr. Danker continued, "SelectQuote's unique healthcare information platform remains best positioned as a value creation conduit, efficiently connecting a large and growing population of Americans in need of coverage and care with the best providers, based on each of their distinct personal needs."

*                         *                         *

**Senior**

**Financial Results**

The following table provides the financial results for the Senior segment for the periods presented:

| (in thousands) | 4Q 2024 | 4Q 2023 | % Change | FY 2024 | FY 2023 | % Change |
|---|---|---|---|---|---|---|
| Revenue | $ 114,143 | $ 103,592 | 10 % | $ 655,849 | $ 590,131 | 11 % |
| Adjusted EBITDA* | 27,872 | 16,147 | 73 % | 166,744 | 155,077 | 8 % |
| Adjusted EBITDA Margin* | 24 % | 16 % | | 25% | 26% | |

*

|  | Three Months Ended June 30, | | Year Ended June 30, | |
|---|---|---|---|---|
|  | 2024 | 2023 | 2024 | 2023 |
| REVENUE: | | | | |
| Commissions and other services | $ 165,656 | $ 141,873 | $ 856,923 | $ 763,301 |
| Pharmacy | 141,552 | 79,905 | 464,853 | 239,547 |
| Total revenue | 307,208 | 221,778 | 1,321,776 | 1,002,848 |
| | | | | |
| OPERATING COSTS AND EXPENSES: | | | | |
| Cost of commissions and other services revenue | 64,548 | 65,697 | 318,798 | 301,524 |
| Cost of goods sold—pharmacy revenue | 120,644 | 71,211 | 405,004 | 225,963 |
| Marketing and advertising | 70,181 | 63,521 | 358,858 | 301,245 |
| Selling, general, and administrative | 43,993 | 49,856 | 141,042 | 136,518 |
| Technical development | 9,233 | 7,154 | 33,524 | 26,015 |
| Total operating costs and expenses | 308,599 | 257,439 | 1,257,226 | 991,265 |
| | | | | |
| INCOME (LOSS) FROM OPERATIONS | (1,391) | (35,661) | 64,550 | 11,583 |
| | | | | |
| INTEREST EXPENSE, NET | (23,409) | (21,721) | (93,551) | (80,606) |
| OTHER EXPENSE, NET | (15) | (3) | (65) | (121) |
| LOSS BEFORE INCOME TAX EXPENSE (BENEFIT) | (24,815) | (57,385) | (29,066) | (69,144) |
| INCOME TAX EXPENSE (BENEFIT) | 6,202 | (9,547) | 5,059 | (10,600) |
| | | | | |
| NET LOSS | $ (31,017) | $ (47,838) | $ (34,125) | $ (58,544) |

40.    On  September 13, 2024, the Company submitted its annual report for the fiscal year ended June 30, 2024 on a Form 10-K filed with the SEC (the "FY24 10-K"). The FY24 10-K affirmed the previously reported financial results. The FY24 10-K reported the manner in which the Company alleged to collect and record revenue, as follows, in relevant part:

*Revenue*

We earn revenue in the form of commission payments from our insurance carrier customers, for the initial year the insurance policy is in effect ("first year") and, where applicable, for each subsequent year the policy renews ("renewal year"), in

31

addition to production bonuses and marketing development funds received from some insurance carriers. Production bonuses are based on attaining various predetermined target sales levels or other agreed upon objectives, whereas marketing development funds may or may not contain such predetermined targets and are used to purchase leads. These, along with other services revenue from Healthcare Services (excluding SelectRx revenue discussed below) and our lead generation business, InsideResponse (of which the majority is eliminated as intersegment revenue), are presented in our consolidated statements of comprehensive loss as commissions and other services revenue. Pharmacy revenue on the consolidated statements of comprehensive loss includes revenue from the sale of prescription and OTC medication products from SelectRx.

Revenue is recognized at different milestones for Senior, Life, and Auto & Home and is based on the contractual enforceable rights, our historical experience, and established customer business practices. Other services revenues from our Healthcare Services segment (excluding SelectRx revenue discussed below) is recognized when the performance obligation has been met, which is at different times for our various services (e.g. the HRA has been performed, a transfer has been made to a health-related partner, or SPM has provided care management services to a member), the transaction price is known based on volume and contractual prices, and we have no further performance obligations. Lead generation revenue is recognized when the generated lead is accepted by our customers, which is the point of sale, and we have no performance obligation after the delivery. Revenues generated from SelectRx are recognized upon shipment. At the time of shipment, we have performed all of our performance obligations and control of the product has been transferred to the customer. There are no future revenue streams or variable consideration associated as the transaction price is fixed at time of shipment, and any subsequent new order is its own performance obligation.

41.    The FY24 10-K stated the following regarding the Company's purported "business model," and products, including that the Company's "***agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer***," as follows in relevant part:

**Our Business Model**

Our insurance distribution business operates in an attractive segment of the insurance value chain, distributing insurance products on behalf of our insurance carrier partners who, in return, pay us commissions. Accordingly, we do not generate revenues directly from the consumers with whom we interact. In addition, because we are not the issuer of the insurance policy to the consumer, we bear no underwriting risks.

*                    *                    *

We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market, as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. Our agents are trained to offer unbiased advice in order to align with the specific needs of each customer.

\*                              \*                              \*

### *Our Products*

The core insurance products we distribute on behalf of our insurance carrier partners are needs-based and critical to the overall financial well-being of consumers and the protection of their most valued assets: their families, their health, and their property. Increasing household financial obligations, rising healthcare costs, importance of health and well-being, and government and lender mandates for certain insurance coverage drive the need for the insurance products we distribute. These products are underwritten by our carefully selected insurance carrier partners and sold by our agents across our three insurance distribution businesses: Senior, Life, and Auto & Home. Additionally, through our Healthcare Services business, we offer pharmaceutical products and other health-related services.

Senior was launched in 2010 and provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans as well as prescription drug and dental, vision, and hearing ("DVH") plans, and critical illness products. We represent approximately 25 leading, nationally-recognized insurance carrier partners, including carriers owned by UnitedHealthcare ("UHC"), Humana, Wellcare, and Aetna. MA and MS plans accounted for 91% of our approved Senior policies for the year ended June 30, 2024, with other ancillary type policies accounting for the remainder.

\*                              \*                              \*

We evaluate our business using the following four segments:

Senior was launched in 2010 and provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans as well as prescription drug and dental, vision, and hearing ("DVH") plans, and critical illness products. We represent approximately 25 leading, nationally-recognized insurance carrier partners, including UHC, Humana, Aetna, and Wellcare. MA and MS plans accounted for 91%, 89%, and 82% of our approved Senior policies for the years ended June 30, 2024, 2023, and 2022, respectively, with other ancillary type policies accounting for the remainder.

42.    The FY24 10-K stated the following regarding the Company's purported insurance carrier partners and the manner in which the Company alleged to receive "commissions and other forms of compensation" as follows in relevant part:

### Our Partners

We maintain long-standing, deeply integrated relationships with approximately 65 of the nation's leading insurance carriers, who have some of the industry's most widely recognizable brand names. During our most recent fiscal years, our primary insurance carrier partners were United Healthcare ("UHC"), Humana, WellCare, and Aetna in Senior; Mutual of Omaha, TruStage, and Pacific Life in Life; and Travelers, Safeco, and Progressive in Auto & Home. These high-quality relationships have resulted in strong insurance carrier retention rates over time. We believe carriers see our method of acquiring customers as scalable and efficient and, ultimately, as cost advantageous compared to their own models. Our insurance carrier partners are responsible for paying us consideration for our services through commissions and other forms of compensation, and, for these purposes, act as our customers. We do not generate revenues directly from the consumers to whom we sell insurance policies on behalf of our insurance carrier partners.

Separate from our comparison-shopping platform, we have established carrier-specific sales platform arrangements with several of our insurance carrier partners, which we call "pods." These arrangements give us access to various marketing assets from our insurance carrier partners, such as use of the insurance carrier's brand, which allows us to target customers for specific insurance carrier partners to give us access to incremental sales volume. Consumers directed to a pod agent come from either leads that are not branded as SelectQuote or come directly from an insurance carrier-affiliated channel. The number of insurance carrier partners with which we have pod relationships can vary quarter to quarter depending on the insurance carrier partner and the segment.

The relationships with our insurance carrier partners such as UHC, Aetna, Anthem, and Humana, has grown through SelectRx and Population Health, as we gather valuable data for them by performing HRAs. We have also formed partnerships with several pharmacy benefit managers including OptumRx, Caremark CVS, and Express Scripts, which help support SelectRx, as well as several providers of health-related resources that support improved health outcomes as partners for Population Health.

43.    The FY23 10-K purported to warn of the risks to the Company, including those related to compliance with law and regulation, which "***may***" or "***could***" impact the Company, as follows in relevant part:

**Risks Related to Laws and Regulation**

***Laws and regulations regulating insurance activities are complex and could have a material and adverse effect on our business, reduce our profitability, and potentially limit our growth.***

The insurance industry in the United States is heavily regulated. The insurance regulatory framework addresses, among other things: granting licenses to companies and agents to transact particular business activities; and regulating trade, marketing, compensation and claims practices. For example, we are required by state regulators to maintain a valid license in each state in which we transact insurance business and comply with business practice requirements that vary from state to state. In addition, our agents who transact insurance business must also maintain valid licenses. Complying with the regulatory framework requires a meaningful dedication of management and financial resources. Due to the complexity, periodic modification and differing interpretations of insurance laws and regulations, we may not have always been, and we may not always be, in full compliance with them. There can be no assurance that we, our employees, consultants, contractors and other agents are in full compliance with current and/or future laws and regulations or interpretations. Any such non-compliance could impose material costs on us, result in limitations on the business we conduct or damage our relationship with regulatory bodies, our insurance carrier partners and consumers, any of which could have a material and adverse effect on our business, operating results, financial condition and prospects.

*                    *                    *

***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans and other health-related products and services could harm our business, operating results, financial condition and prospects.***

Our Senior segment is subject to a complex legal and regulatory framework, and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS related to Medicare Advantage and Medicare Part D Prescription Drug plans, change frequently. For example, in April 2023, CMS finalized rules that could increase compliance costs and otherwise impact our business results by, among other things, requiring new disclosures that could make certain forms of marketing less practicable and potentially requiring a 48-hour waiting period between initial contact with a beneficiary and enrolling that beneficiary. In April 2024, CMS adopted final rules placing limitations on the compensation of certain distributors of Medicare products and establishing certain contractual standards for dual eligible special needs plans enrollments, among other things. To the extent they are determined to apply to our operations, these and any other changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation, or the

manner in which they are enforced could harm our business, operating results, financial condition and prospects.

In addition, changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods.

44.    The above statements identified in ¶¶ 19-43 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company was directing Medicare beneficiaries to the plans offered by insurers that best compensated SelectQuote, regardless of the quality or suitability of the insurers' plans; (2) that SelectQuote did not provided unbiased comparison shopping for Medicare Advantage insurance plans; (3) that SelectQuote received illegal kickbacks to steer Medicare beneficiaries to certain insurers and limit enrollment in competitors' plans; (4) that as a result, SelectQuote had not complied with applicable laws, regulations, and contractual provisions; (5) that SelectQuote was vulnerable to regulatory and legal sanctions as a result of its conduct, including claims that it had violated the False Claims Act; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

45.    On May 1, 2025, at approximately noon eastern standard time, the DOJ filed a False Claims Act complaint against SelectQuote (the "DOJ Complaint"). The DOJ Complaint alleged, among other things, "[f]rom 2016 *through at least 2021*" SelectQuote received "tens of millions of dollars" in "illegal kickbacks" from health insurance companies in exchange for steering

Medicare beneficiaries to enroll in the insurers' Medicare Advantage plans. The DOJ Complaint further alleged, in exchange for kickbacks, SelectQuote engaged in a conspiracy with major insurers to illegally discriminate against beneficiaries deemed to be less profitable by taking actions to "reduce or limit the proportion of persons with disabilities that the brokers enrolled" in their plans. The DOJ Complaint alleged that SelectQuote made, or caused to be made, materially false claims, including that it to offers "unbiased coverage comparisons" when in fact it "*repeatedly directed Medicare beneficiaries to the plans offered by insurers that paid them the most money, regardless of the quality or suitability of the insurers' plans*." Specifically, the DOJ Complaint alleges as follows, in relevant part:

From 2016 through at least 2021, three of the nation's largest health insurance companies offering Medicare Advantage plans—Aetna, Anthem, and Humana—(together, the "Defendant Insurers")—knowingly and willfully paid hundreds of millions of dollars in kickbacks to some of the nation's largest insurance brokers—eHealth, GoHealth, and *SelectQuote* (together, the "Defendant Brokers")—*to induce them to steer beneficiaries into the Defendant Insurers' Medicare Advantage plans. In public statements, the Defendant Brokers claimed to be "unbiased," "carrier-agnostic," and to "have your best interests in mind." In private, however, the Defendant Brokers repeatedly directed Medicare beneficiaries to the plans offered by insurers that paid them the most money, regardless of the quality or suitability of the insurers' plans.* They incentivized their agents to sell those plans; set up teams of agents who could sell only those plans; and at times "shut off," or refused to sell, plans of insurers who did not pay or did not pay enough in kickbacks. As one broker executive explained about Aetna, for example, "more money will help drive more sales [be]cause your product is dog sh[*]t."

*Defendants hid the true nature of agreements behind contracts and invoices that purported to cover only the cost of marketing or administrative services.* All the while, Defendants knew what they were doing was illegal. For example, when discussing a purported "marketing" agreement with Humana, one eHealth executive joked that Humana was paying eHealth "$15M/year for a [web]site that drives 15 enrollments per year. CMS will surely never figure that one out. . . . Luckily the govt are generally morons." Meanwhile, when discussing Aetna's sham agreements, another eHealth executive wrote that the "marketing" payment model was "not even a little compliant. . . . I'm pretty sure if Aetna got audited by cms, they'd be fu[**]ed." And though Anthem kept the true purpose of its "marketing" payments out of its contracts with brokers, Anthem executives often referenced the "underlying business agreement" of money for sales.

*Further, Aetna and Humana used their kickbacks to the Defendant Brokers not only to buy enrollments in their plans, but also to pressure brokers to enroll fewer Medicare beneficiaries with disabilities, whom the insurers perceived as more expensive to cover.* Because Medicare Advantage is a guaranteed issue program for all Medicare-eligible beneficiaries, federal law bars insurers from favoring enrollment of healthier beneficiaries and discriminating against beneficiaries with disabilities who might be less profitable. But Aetna and Humana did just that.

*In response to these financial inducements from Aetna and Humana, the Defendant Brokers rejected referrals of disabled beneficiaries, filtered telephone calls from disabled beneficiaries, and strategically directed disabled beneficiaries away from Aetna and Humana plans.* These actions illegally reduced the ability of disabled Medicare beneficiaries to access and enroll in Aetna and Humana plans.

*            *            *

68. Each Defendant Broker claimed to be unbiased, and each generally claimed to seek to match a beneficiary's needs to an insurance plan.

*            *            *

73. SelectQuote likewise asserted in its Registration Statement with the U.S. Securities and Exchange Commission that it "provide[d] unbiased comparison shopping for Medicare Advantage . . . insurance plans."

74. Its website and advertisements described SelectQuote as offering "unbiased plan options" and "serv[ing] as your advocate" in reviewing Medicare Advantage options. SelectQuote claimed that "[a]t SelectQuote, we can do the work for you. We offer unbiased coverage comparisons . . . ."

*            *            *

**Humana's Kickbacks to SelectQuote**

198. SelectQuote and Humana first entered into a broker agreement in or around 2015. Over the next six years, Humana agreed to pay tens of millions of dollars in kickbacks to SelectQuote, ostensibly for the purpose of conducting "marketing" campaigns involving the purchase or generation of "leads."

199. In reality, Humana conditioned those payments on (1) SelectQuote delivering specific quantities of Medicare Advantage enrollments for Humana, (2) SelectQuote maintaining a "pod" of agents that sold only Humana policies, and (3) SelectQuote's other "multi-carrier" agents steering a substantial share of their overall business to Humana.  200. In return for the payments, SelectQuote both promised to and did take specific actions to steer Medicare enrollments to Humana.

*            *            *

243. **2020.** In 2020, Humana sought more sales from SelectQuote and a return to being SelectQuote's favored MAO. Humana therefore agreed to pay SelectQuote a total of approximately $18.7 million in purported marketing funding over the course of that year.

       *       *       *

251. **2021.** In 2021, Humana paid SelectQuote approximately $29.5 million in purported marketing funding.

       *       *       *

Aetna's Kickbacks to SelectQuote

       *       *       *

451. **2020.** In 2020, Aetna paid SelectQuote nearly $4.9 million in "Market Development Funding."

       *       *       *

456. **2021.** In 2021, Aetna paid SelectQuote approximately $7.4 million in "marketing" money.

457. Well into 2021, SelectQuote made clear that it would not steer to Aetna unless doing so made financial sense to SelectQuote.

46. On this news, SelectQuote's stock price fell $0.61, or 19.2%, to close at $2.56 per share on May 1, 2025, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

47. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired SelectQuote securities between September 9, 2020 and May 1, 2025, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SelectQuote's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of SelectQuote shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by SelectQuote or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SelectQuote; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

52.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

53.      The market for SelectQuote's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, SelectQuote's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired SelectQuote's securities relying upon the integrity of the market price of the Company's securities and market information relating to SelectQuote, and have been damaged thereby.

54.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SelectQuote's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about SelectQuote's business, operations, and prospects as alleged herein.

55.      At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about SelectQuote's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

56.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

57.    During the Class Period, Plaintiff and the Class purchased SelectQuote's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

58.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding SelectQuote, their control over, and/or receipt and/or modification of SelectQuote's allegedly materially misleading misstatements

and/or their associations with the Company which made them privy to confidential proprietary information concerning SelectQuote, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

59.     The market for SelectQuote's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, SelectQuote's securities traded at artificially inflated prices during the Class Period. On April 6, 2021 the Company's stock price closed at a Class Period high of $32.28 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of SelectQuote's securities and market information relating to SelectQuote, and have been damaged thereby.

60.     During the Class Period, the artificial inflation of SelectQuote's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SelectQuote's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of SelectQuote and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

61.     At all relevant times, the market for SelectQuote's securities was an efficient market for the following reasons, among others:

(a)    SelectQuote shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, SelectQuote filed periodic public reports with the SEC and/or the NYSE;

(c)    SelectQuote regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    SelectQuote was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

62.    As a result of the foregoing, the market for SelectQuote's securities promptly digested current information regarding SelectQuote from all publicly available sources and reflected such information in SelectQuote's share price. Under these circumstances, all purchasers of SelectQuote's securities during the Class Period suffered similar injury through their purchase of SelectQuote's securities at artificially inflated prices and a presumption of reliance applies.

63.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to

recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

64.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SelectQuote who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

65.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

66.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SelectQuote's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

67.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SelectQuote's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

68.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SelectQuote's financial well-being and prospects, as specified herein.

69.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of SelectQuote's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SelectQuote and its business operations and future prospects in

light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

70.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

71.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SelectQuote's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual

knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

72.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of SelectQuote's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired SelectQuote's securities during the Class Period at artificially high prices and were damaged thereby.

73.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that SelectQuote was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their SelectQuote securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

74.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

76.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

77.     Individual Defendants acted as controlling persons of SelectQuote within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.     As set forth above, SelectQuote and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 11, 2025

/s/ _Rebecca Dawson_

**GLANCY PRONGAY & MURRAY LLP**
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email:  rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: clinehan@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

_Counsel for Plaintiff Robert Pahlkotter_

## SWORN CERTIFICATION OF PLAINTIFF

## SELECTQUOTE, INC. SECURITIES LITIGATION

I, Robert Pahlkotter, certify that:

1.  I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase the SelectQuote, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in SelectQuote, Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.


I declare under penalty of perjury that the foregoing are true and correct statements.


8/7/2025
_____
Date

*Robert Pahlkotter*
_____
Robert Pahlkotter

**Robert Pahlkotter's Transactions in SelectQuote, Inc. (SLQT)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 3/20/2025 | Bought | 3,789 | $3.7700 |
| 3/20/2025 | Bought | 300 | $3.7800 |
| 3/20/2025 | Bought | 2,735 | $3.7900 |
| 3/20/2025 | Bought | 18,176 | $3.8000 |