# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT PAHLKOTTER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SELECTQUOTE, INC., TIM DANKER, RYAN CLEMENT, RAFFAELE SADUN, and ROBERT GRANT,<br><br>Defendants. | Case No. 1:25-cv-06620-JLR<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION AND OVERVIEW ................................................................ 1

II.    JURISDICTION AND VENUE ........................................................................................... 5

III.   PARTIES  AND RELEVANT NON-PARTIES ................................................................ 6

     A.    Plaintiff ................................................................................................................... 6

     B.    Defendants .............................................................................................................. 6

     C.    Former Employees ................................................................................................. 8

IV.   SUBSTANTIVE ALLEGATIONS .................................................................................... 9

     A.    Background and Company Functions ..................................................................... 9

     B.    SelectQuote's Senior Segment, Which Sells Medicare Advantage Plans, Was Its Most Lucrative During The Class Period .............................................................. 11

     C.    Throughout The Class Period Company Stated It Provided Unbiased Comparison Shopping For Medicare Advantage Insurance Plans ........................................... 12

     D.    The Company's Revenue is Dependent on the Sale of Medicare Advantage Plans ..................................................................................................................... 12

     E.    The Tension Between SelectQuote's Profit Model And Its Business Model Of Providing "Unbiased" Comparison Shopping ..................................................... 13

     F.    SelectQuote Is Required To Comply With Federal Regulations .......................... 14

           1.    The Centers For Medicare And Medicaid Services Limits Compensation To Brokers ................................................................................................. 14

           2.    The Anti-Kickback Statute Limits Compensation To Brokers ................. 15

           3.    Federal Regulations Regarding The False Claims Act ............................. 18

     G.    Contrary To SelectQuote's Legal Obligations And "Unbiased" Business Model, SelectQuote Directed Medicare Beneficiaries To Plans Offered By Insurers That Paid Them For That Purpose, Regardless Of Their Suitability ........................... 19

           1.    SelectQuote and Humana ......................................................................... 24

           2.    SelectQuote and Aetna ............................................................................. 30

     H.    SelectQuote Understood That Its Kickback Arrangements And Resulting Preferences For Paying Insurers Caused Problems For Beneficiaries ................. 34

     I.    Former Employees Corroborate Key Elements Of The DOJ's Allegations .......... 35

           1.    Former Employee Corroborate That SelectQuote Received Bonuses Beyond The Standard Commission Schedule ............................................ 35

           2.    Former Employees Corroborate That The Company Maintained Pods Which Sold Only Select Plans ................................................................. 35

i

    3.    Former Employees Corroborate That The Company Internal Quoting Tools Could Be Used As Suppression Tools............................................. 36

J.    The Truth Emerges When The DOJ Intervenes In An Action Against The Nation's Largest Insurance Companies And Three Large Brokers, Revealing The Scope And Extent Of SelectQuote's Illegal Activities ............................................. 36

V.    DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS ................................................................................................. 37

A.    The Company's Statements About Providing Unbiased Advice.......................... 37

    1.    Statements Concerning FY 2020 ............................................................. 37

    2.    Statements Concerning FY 2021 And Interim Periods Within FY 2021 .. 40

    3.    Statements Concerning FY 2022 And Interim Periods Within FY 2022 .. 47

    4.    Statements Concerning FY 2023 And Interim Periods Within FY 2023 .. 51

    5.    Statements Concerning FY 2024 And Interim Periods Within FY 2024 .. 54

    6.    Statements Concerning FY 2025 And Interim Periods Within FY 2025 .. 57

B.    Additional Statements About Quality Of SelectQuote's Customer Service And Customer-First Approach ........................................................................... 60

C.    The Company's Statements About Risks Related To Compliance With Laws And Regulations ........................................................................................... 62

VI.    ADDITIONAL SCIENTER ALLEGATIONS............................................................... 72

A.    Scienter As To Funds Received From Humana Specifically ............................... 73

B.    Scienter As To Funds Received From Aetna Specifically ................................... 77

C.    Corporate Scienter and Respondeat Superior ...................................................... 78

D.    Defendants' Access To Information And Core Operations .................................. 83

VII.    LOSS CAUSATION ..................................................................................................... 84

VIII.    CLASS ACTION ALLEGATIONS .............................................................................. 86

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)................................................................................................................. 88

X.    NO SAFE HARBOR ..................................................................................................... 89

XI.    CLAIMS FOR RELIEF ................................................................................................ 89

PRAYER FOR RELIEF............................................................................................................... 94

JURY TRIAL DEMANDED ....................................................................................................... 94

Lead Plaintiff Robert Pahlkotter ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by SelectQuote, Inc. ("SelectQuote" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by SelectQuote; (c) interviews of former SelectQuote employees; and (d) review of other publicly available information concerning SelectQuote.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired SelectQuote common stock between September 9, 2020 and May 1, 2025, inclusive (the "Class Period"), and were damaged thereby.  Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    SelectQuote is an insurance broker which, according to SelectQuote's public statements, operates an insurance marketplace that allows consumers to compare and purchase policies from an unbiased, curated network of highly-rated insurance carriers, facilitated by insurance agents trained to offer unbiased advice.  Throughout the Class Period, SelectQuote advertised the nature of its "***unbiased***"[1] comparison shopping experience heavily; nearly every

---

[1]    Unless otherwise stated, all emphasis in this Complaint in bold and/or italics has been added, and all footnotes are omitted.

1

press release the Company issued crows that SelectQuote "pioneered the model of providing unbiased comparisons."[2]

3.     SelectQuote reports its results in four segments: Senior, Life, Auto & Home, and starting in 2021, Healthcare Services.  The Senior segment is the Company's largest single segment.  In fiscal year 2020,[3] Senior segment revenue represented 68% of SelectQuote's total revenue; in 2021, that rose to 78%.[4]  Throughout the Class Period, the Senior segment purported to provide "***unbiased comparison shopping for Medicare Advantage . . . and Medicare Supplement . . . insurance plans***."[5]  These Medicare Advantage and Medicare Supplement plans accounted for the vast majority of the Company's approved senior policies.  For example, in 2020, Medicare Advantage and Medicare Supplement plans accounted for 78% of Senior polices sold,[6] rising year-over-year to 91% in fiscal year 2024.[7]

4.     Many Medicare beneficiaries seek help from insurance brokers like SelectQuote in considering their health plan options due to the sheer number of different insurance providers, each offering different Medicare Advantage plans with distinct provider networks and benefits.  Brokers like SelectQuote advertise their services as a way to navigate the complex provider services

---

[2]     *See e.g.* SelectQuote's press release announcing financial results for the first quarter ending on December 31, 2024, published February 10, 2025.  *See also infra* Sec. IV. A.

[3]     The Company maintains a fiscal year ending on June 30 of each year.  Fiscal year 2020 ended on June 30, 2020.

[4]     SelectQuote Annual Report for the fiscal year ending June 30, 2021, filed on Form 10-K with the SEC on August 26, 2021.

[5]     *See e.g.* SelectQuote Annual Report for the fiscal year ending June 30, 2024, filed on Form 10-K with the SEC on September 13, 2024.  *See also infra* Sec. IV.A.

[6]     SelectQuote Annual Report for the fiscal year ending June 30, 2020, filed on Form 10-K with the SEC on September 10, 2020.

[7]     SelectQuote Annual Report for the fiscal year ending June 30, 2024, filed on Form 10-K with the SEC on September 13, 2024.

network with the help of agents "trained to offer unbiased advice" in order to help beneficiaries select a policy "aligned to the specific needs of each customer."[8]

5.       While insurance companies are permitted to provide *some* limited compensation to insurance brokers like SelectQuote for their services, this compensation must only be used to "create[] incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that *is intended to best meet their health care needs*." 42 U.S.C. § 1395w-21(i)(2)(D).  For this reason, the Centers for Medicare and Medicaid Services, imposes a cap on the amount that an insurers can pay a broker as "compensation" for enrollment of a beneficiary in one of its Medicare Advantage plans. 42 C.F.R. § 422.2274(a) (2021).

6.       In addition to "compensation" for enrollments, insurers are also permitted to pay brokers for certain *bona fide* administrative services, but insurers must "*not use these administrative payments as a means to circumvent the limits on compensation to agents and brokers.*" 86 Fed. Reg. 5864, 5994 (Jan. 19, 2021).  Thus, administrative payments cannot be paid in exchange for enrollments or enrollment-related services.

7.       The Centers for Medicare and Medicaid Services warns that excessive payments from insurance companies to brokers can violate federal laws, for example, if such payments involve *"compensation that varies based on the attainment of certain enrollment targets*." 73 Fed. Reg. 54226, 54239 (Sept. 18, 2008).  To that end, the Federal Anti-Kickback Statute bars the solicitation, receipt, offer, or payment of "illegal remunerations." 42 U.S.C. § 1320a-7b(b).  These "illegal remunerations" include, in relevant part, "any remuneration (including any kickback, bribe, or rebate)" paid in return for "arranging for or recommending purchasing" "any good,

---

[8]      *See e.g.* SelectQuote Annual Report for the fiscal year ending June 30, 2020, filed on Form 10-K with the SEC on September 10, 2020.

facility, service, or item for which payment may be made in whole or in part under a Federal health care program." *Id.* § 1320a-7b(b)(l). A violation of the Anti-Kickback Statute creates automatic civil liability under federal law, specifically under the False Claims Act. 31 U.S.C. §§ 3729-3733.

8.      Unbeknownst to investors, contrary to SelectQuote's legal obligations and its emphatic touting of an unbiased business model and a dedication to agents trained to offer unbiased advice, prior to and throughout the Class Period, SelectQuote routinely directed Medicare beneficiaries to plans offered by insurers that paid the Company kickbacks, regardless of the quality or suitability of the insurers' plans.

9.      The truth was revealed on May 1, 2025, at approximately noon eastern standard time, when the U.S. Department of Justice ("DOJ") announced that it had filed a 217-page Complaint in Partial Intervention against SelectQuote alleging violations of the False Claims Act and common law  (the "DOJ Complaint").[9]  The DOJ Complaint revealed that "[f]rom 2016 through **at least** 2021,"[10] SelectQuote received "tens of millions of dollars"[11] in "illegal kickbacks"[12] from health insurance companies in exchange for steering Medicare beneficiaries to enroll in the insurers' Medicare Advantage plans.   The DOJ also revealed the financial arrangements between SelectQuote and insurers were falsely or misleadingly reported as "marketing" fees.[13]

---

[9]      The allegations originated with a sealed *Qui Tam* whistleblower complaint filed in November 2021.  *United States Of America ex rel. Andrew Shea, v. Ehealth, Inc.*, et al., 21-cv-11777 (ECF Dkt. No. 1).  That action and the underlying allegations remained sealed until the filing of the DOJ Complaint.  *Id.* at ECF Dkt. No. 41.  A copy of the DOJ Complaint is attached hereto as Exhibit 1, and its allegations are incorporated by reference herein.

[10]      DOJ Complaint at 1.

[11]      DOJ Complaint ¶198.

[12]      DOJ Complaint ¶110.

[13]      DOJ Complaint ¶¶198; 228; 378-379; 456.

10.    The DOJ Complaint also alleges that SelectQuote, in exchange for kickbacks, engaged in conspiracies with Aetna and Humana to reduce enrollment of disabled beneficiaries, a cohort perceived as costlier and less profitable to cover.

11.    The DOJ Complaint alleges that SelectQuote made materially false claims by stating it offers "unbiased coverage comparisons" when in fact it "repeatedly directed Medicare beneficiaries to the plans offered by insurers that paid them the most money, regardless of the quality or suitability of the insurers' plans."[14]

12.    The DOJ also uncovered a series of incriminating internal communications that, according to the DOJ Complaint, demonstrate the "[d]efendants knew what they were doing was illegal."[15]

13.    On this news, SelectQuote's stock price fell $0.61, or 19.2%, to close at $2.56 per share on May 1, 2025, on unusually heavy trading volume.

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein,

---

[14]    DOJ Complaint at ¶¶73-74.

[15]    DOJ Complaint at 1.

including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES AND RELEVANT NON-PARTIES

### A.    Plaintiff

18.     Lead Plaintiff Robert Pahlkotter, as set forth in the certification previously filed with the Court, incorporated by reference herein (ECF No. 1 at 53-54), purchased SelectQuote common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.    Defendants

19.     Defendant SelectQuote is incorporated under the laws of Delaware with its principal executive offices located in Overland Park, Kansas.  SelectQuote's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "SLQT."

20.     Defendant Tim Danker ("Danker") was the Company's Chief Executive Officer ("CEO") at all relevant times.  Danker has served as the CEO of SelectQuote since 2017.  He previously served as the President of the Company's Life segment from 2016 to 2019, as the Executive Vice President of the Company's Life segment from 2015 to 2016, and as the President of the Company's Auto & Home segment from 2012 to 2015.  Mr. Danker received his undergraduate degree in business administration from the University of Missouri and his Masters of Business Administration degree from the University of Kansas.

21.     Throughout the Class Period, Danker spoke to investors and analysts on conference

calls. Danker possessed the power and authority to control the contents of the Company's public filings with the SEC.

22.    Defendant Ryan Clement ("Clement") has been the Company's Chief Financial Officer ("CFO") since May 2022.  Clement joined SelectQuote in January of 2022.  Prior to working at SelectQuote, Ryan served as the Chief Financial Officer of Sifted, a logistics software company.  Prior to working at Sifted, Ryan spent seven years at Edelman Financial Engines, a Registered Investment Advisory firm, and served in various senior level Finance and Operational roles. Ryan earned his undergraduate and MBA from the University of Missouri.

23.    Throughout the Class Period, Clement spoke to investors and analysts on conference calls.  Clement possessed the power and authority to control the contents of the Company's public filings with the SEC.

24.    Defendant Raffaele Sadun ("Sadun") was the Company's CFO from 2017 until May, 2022.  Before coming to SelectQuote, Sadun served as the CFO of The Mutual Fund Store, an independent registered investment advisor.  Sadun then served as the Senior Vice President of Finance for Financial Engines from 2016-2017.  Prior to that, he served as the CFO of Adknowledge, a digital advertising company, from 2012-2014, and as the CFO of SeaWorld Parks & Entertainment from 2010-2011.  He is an honors graduate in Management of The London School of Economics.

25.    Throughout the Class Period, Sadun spoke to investors and analysts on conference calls.  Sadun possessed the power and authority to control the contents of the Company's public filings with the SEC.

26.    Defendant Robert (Bob) Grant ("Grant") has served as the President of SelectQuote since 2021.  Previously, Grant served as President of SelectQuote's Senior division from 2019 to

2021.  Grant also served as the Company's Chief Revenue Officer from 2017 to 2019, and prior to that, he served as the Senior Vice President of Sales of the Life division from 2016 to 2017 and as the Director of Sales and Operations for the Senior division from 2013 to 2016.  He received his undergraduate degree from the University of Kansas.

27.     Throughout the Class Period, Grant spoke to investors and analysts on conference calls.  Grant possessed the power and authority to control the contents of the Company's public filings with the SEC.

28.     Defendants Danker, Clement, Sadun, and Grant (together, the "Individual Defendants"), because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material nonpublic information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## C.    Former Employees

29.     Former Employee #1 ("FE1") was a General Manager with SelectQuote Senior Insurance Services from April 2020 to August 2022.  FE1 reported to Ron Maurno, former senior director of sales, and later to Jack Sieger, former senior director of sales operations.  FE1 attended "kickoff" meetings in which managers received instructions regarding salespeople in the Tiburon pod, including one in September/October of 2021, wherein Defendant Sadun discussed, *inter alia*

reports of business-to-business payments.  FE1 has knowledge of the allegations contained herein from, *inter alia*, reviewing "upper leadership reports" of these payments as more fully detailed *infra* ¶111.

30.    Former Employee #2 ("FE2") was a Medicare Sales Agent with SelectQuote Senior Insurance Services from March 2020 to March 2021.  FE2's responsibilities included handling sales calls with customers in the Company's Senior Insurance Services segment.  FE2 has knowledge of the allegations contained herein from being involved with "special campaigns" as more fully detailed *infra* ¶112.

31.    Former Employee #3 ("FE3") was an Sales Manager in SelectQuote's Population Health department from August 2023 to January 2025.  Prior to that, he[16] was a Commission Sales Associate from September 2020 to July 2023.  FE3 reported to Mack Wurtz, former senior manager of sales operations.  FE3's responsibilities throughout his tenure included managing approximately 45 agents.  FE3 initially worked as a customer care agent, handling telephone calls from customers. FE3 has knowledge of the allegations herein from, *inter alia*, being extensively trained and training others on the Company's scripts, as more fully detailed *infra* ¶113.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background and Company Functions

32.    SelectQuote is an insurance broker which operates a direct-to-consumer distribution platform for selling insurance policies.[17]  In theory, the Company serves as a digital marketplace, allowing consumers to compare and purchase policies from a curated network of

---

[16]    This complaint uses masculine pronouns for all former employees, irrespective of their gender, in order to preserve their anonymity

[17]    The Company is a licensed insurance producer in all 50 U.S. states and the District of Columbia.

highly-rated insurance carriers.

33.    SelectQuote's model is built on streamlining the insurance shopping process through a blend of proprietary technology and a large, internal agent force.  The process typically begins when a consumer interacts with SelectQuote via television commercials, their website, or online search forms.  SelectQuote then uses proprietary marketing technology to route these leads to its agents.

34.    Once connected to an agent, usually by telephone, consumers provide basic personal information (such as age, location, and health status), and SelectQuote's platform generates an array of potential insurance plan quotes.  Agents then (according to SelectQuote) offer unbiased comparisons and help the customer choose a specific plan which suits their needs best.  The application is then finalized and submitted to the respective insurance company selected. The service is free for consumers.  SelectQuote earns revenue through commissions paid by the insurance carriers once a policy is successfully sold.

35.    The purportedly unbiased natured of the Company's services was therefore key to the Company's value-proposition, allowing consumers to choose policies based on *their* unique needs rather than a specific carrier's internal sales goals.  Throughout the Class Period, SelectQuote advertised the nature of its "*unbiased*" comparison shopping experience heavily; nearly every press release the Company issued crows that the Company "pioneered the model of providing unbiased comparisons."[18]

---

[18]    *See e.g.* SelectQuote's press release announcing financial results for the first quarter ending on December 31, 2024, published February 10, 2025. *See also infra* Sec. IV.A.

**B.    SelectQuote's Senior Segment, Which Sells Medicare Advantage Plans, Was Its Most Lucrative During The Class Period**

36.    SelectQuote reports its results in four segments: Senior, Life, Auto & Home, and starting in 2021, Healthcare Services.  The Company's Senior Segment was and is critical to the Company.  For example, in fiscal year[19] 2020, SelectQuote's Senior segment revenue represented 68% of total revenue, rising to 78% in 2021.[20]

37.    Medicare Advantage and Medicare Supplement plans account for the vast majority of the Company's approved senior policies.   In 2020, Medicare Advantage and Medicare Supplement plans accounted for 78% of Senior polices sold,[21] rising year-over-year to 91% in fiscal year 2024.[22]

38.    Many Medicare beneficiaries seek help from insurance brokers like SelectQuote in considering their health plan options, due to the many different insurance providers each offering different Medicare Advantage plans with distinct provider networks and benefits.  Brokers like SelectQuote advertise their services as a way to navigate the complex provider services network with the help of agents "trained to offer unbiased advice" in order to help beneficiaries select a policy "aligned to the specific needs of each customer."[23]

---

[19]    The Company maintains a fiscal year end on June 30th annually.

[20]    SelectQuote Annual Report for the fiscal year ending June 30, 2021, filed on Form 10-K with the SEC on August 26, 2021.

[21]    SelectQuote Annual Report for the fiscal year ending June 30, 2020, filed on Form 10-K with the SEC on September 10, 2020.

[22]    SelectQuote Annual Report for the fiscal year ending June 30, 2024, filed on Form 10-K with the SEC on September 13, 2024.

[23]    *See e.g.* SelectQuote Annual Report for the fiscal year ending June 30, 2020, filed on Form 10-K with the SEC on September 10, 2020.

**C.    Throughout The Class Period Company Stated It Provided Unbiased Comparison Shopping For Medicare Advantage Insurance Plans**

39.    Throughout the Class Period, at the core of SelectQuote's business was its assurance that it provided "***unbiased comparison shopping for Medicare Advantage . . . and Medicare Supplement . . . insurance plans***."[24]  In every press release, 10-Q and 10-K filing within the Class Period the Company touted its allegedly "unbiased comparison shopping" services.[25]

40.    Additionally, throughout the Class Period, SelectQuote repeatedly emphasized that the foundation of its business was its "***agents . . . trained to offer unbiased advice in order to align with the specific needs of each customer.***"[26]

**D.    The Company's Revenue is Dependent on the Sale of Medicare Advantage Plans.**

41.    Medicare is a federally funded health insurance program administered by the U.S. Centers for Medicare & Medicaid Services ("CMS").  42 U.S.C. § 1395c *et seq.*  To be eligible for Medicare, a person must be over the age of sixty-five, be disabled, or have end-stage renal disease.  *Id.*  Individuals who are insured or receive benefits through Medicare are often referred to as "Medicare beneficiaries."

42.    The Medicare Program has four "Parts."  Parts A and B are commonly known as "traditional" or "original" Medicare.  Under Medicare Parts A and B, CMS generally reimburses health care providers directly based on payment rates predetermined by the Government.  Medicare Part C, also known as the Medicare Advantage program, is an alternative to traditional Medicare.  Under the Medicare Advantage program, Medicare beneficiaries can elect to opt out of

---

[24]    *See e.g.* SelectQuote Annual Report for the fiscal year ending June 30, 2024, filed on Form 10-K with the SEC on September 13, 2024.

[25]    *See infra* Sec. IV.A.

[26]    *Ibid.*

traditional Medicare and instead receive their Medicare benefits through privately run insurance plans. *See* 42 U.S.C. §§ 1395w-21–1395w-28; 42 C.F.R. § 422.50(a). As of 2025, approximately half of all Medicare beneficiaries are enrolled in Medicare Advantage plans.[27]

43.     Medicare Advantage plans are operated and managed by Medicare Advantage Organizations ("MAOs") (also known as "carriers," or "insurers").[28] Insurers like Humana, Aetna, and Anthem all operate as MAOs within Medicare Advantage.

### E.    The Tension Between SelectQuote's Profit Model And Its Business Model Of Providing "Unbiased" Comparison Shopping

44.     According to SelectQuote, it generates revenue from its Senior segment primarily by earning commissions from selling Medicare-related health insurance products, such as Medicare Advantage, Medicare Supplement, prescription drug plans, and ancillary products (e.g., dental, vision, hearing, critical illness) on behalf of its insurance carrier partners.[29] When a consumer purchases a policy through SelectQuote's platform, SelectQuote earns a commission from the insurance carrier partner for the initial year the policy is in effect and, where applicable, for each subsequent year the policy renews.

45.     Throughout the Class Period, SelectQuote also received certain other revenue from "production bonuses" based on attaining predetermined target sales levels or other agreed-upon objectives, as well as "marketing development funds," which were purportedly used to purchase leads.[30]

46.     However, the Company is limited by federal regulations in the amount and the

---

27      DOJ Complaint ¶38.

28      *See* 42 C.F.R. §§ 422.2, 422.503(b)(2).

29      *See, e.g.*, *supra* n. 5.

30      *Ibid.*

nature of compensation it can receive from insurers, in order to safeguard consumers against coercive 'kickbacks' being paid to steer consumers into insurance plans which benefit SelectQuote and preferred partners, not the customer.

**F.    SelectQuote Is Required To Comply With Federal Regulations**

**1.    The Centers For Medicare And Medicaid Services Limits Compensation To Brokers**

47.    Insurers are permitted to provide some, limited, compensation to insurance brokers for their services, but only to "create[] incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that *is intended to best meet their health care needs*." 42 U.S.C. § 1395w-21(i)(2)(D).

48.    Therefore, CMS imposes a cap on the amount that an insurers can pay a broker as "compensation" for enrollment of a beneficiary in one of its Medicare Advantage plans. 42 C.F.R. § 422.2274(a) (2021). This cap on compensation covers all "monetary or non-monetary remuneration of any kind," such as commissions, bonuses, gifts, prizes, or awards. *Ibid.* The cap is limited such that "[f]or each enrollment in a renewal year, MA plans may pay compensation at an amount up to 50 percent of [the compensation cap for an initial enrollment]." 42 C.F.R. § 422.2274(d)(3).

49.    In addition to "compensation" for enrollments, insurers are also permitted to pay brokers for certain *bona fide* administrative services or "administrative payments." But insurers must "*not use these administrative payments as a means to circumvent the limits on compensation to agents and brokers.*" 86 Fed. Reg. 5864, 5994 (Jan. 19, 2021). Insurers can only pay brokers for administrative services in "amounts that would be fairly negotiated on the open market." *Id.*

50.    Prior to January 2021, if an insurer contracted with a third party "to sell its

insurance products, or perform services" then "[t]he amount paid to the third party for services *other than selling insurance products,*" would be limited to "fair-market value" and could not "exceed an amount that is commensurate with the amounts paid by the [Insurers] to a third party for similar services during each of the previous 2 years."  42 C.F.R. § 422.2274(b)(l)(iv) (2020).

51.     After January 2021, the rules around administrative payments were updated.  *See id.*§ 422.2274(e) (Mar. 2021).  The updated regulations similarly provided that "[p]ayments made for services *other than enrollment of beneficiaries*" "must not exceed the value of those services in the marketplace."  *Id.* § 422.2274(e)(l).  ***Otherwise stated, the law is clear: administrative payments cannot be paid in exchange for enrollments or enrollment-related services.***

52.     In 2008, when CMS first published its regulations on agent and broker compensation, the agency warned that excessive payments from insurer to agents and brokers could violate the federal Anti-Kickback Statute:

> The compensation structure is designed to help prevent inappropriate moves of beneficiaries from plan-to-plan. Parties remain responsible, however, for compliance with fraud and abuse laws, including the Anti-Kickback Statute. Depending on the circumstances, agent and broker relationships can be problematic under the Anti-Kickback Statute if they involve, by way of example only, compensation in excess of fair market value, compensation structures tied to the health status of the beneficiary (for example, cherry-picking), ***or compensation that varies based on the attainment of certain enrollment targets***.

73 Fed. Reg. 54226, 54239 (Sept. 18, 2008).

### 2.    The Anti-Kickback Statute Limits Compensation To Brokers

53.     The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), was enacted in 1972, explicitly out of congressional concern that remuneration provided to parties like insurance brokers could create incentives which conflict with the best interests of patients.[31]

---

[31]     *See* DOJ Complaint ¶21.

54.    Congress strengthened the AKS by amendments in 1977, 1987, and 2010, to ensure that kickbacks masquerading as legitimate transactions did not evade the statute's reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b; Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93; Patient Protection and Affordable Care Act, Pub. L. No. 111-148.[32]

55.    The AKS bars the solicitation, receipt, offer, or payment of "illegal remunerations." 42 U.S.C. § 1320a-7b(b). **Specifically, the AKS bars the solicitation or receipt of illegal remuneration** as follows, in relevant part:

> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind-
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program[33], or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

*Id.* § 1320a-7b(b)(l).

---

[32]    *See also* 73 Fed. Reg. 67406, 67410 (Nov. 14, 2008) (reiterating insurers "should be mindful that their compensation arrangements including arrangements with [brokers] and other similar type entities must comply with the fraud and abuse laws, including the antikickback statute.")

[33]    The AKS defines a "Federal health care program" to mean "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government," except for the health insurance program for federal employees. *Id.* § 1320a-7b(f). The Medicare program, as well as the Medicare Advantage program, is a "Federal health care program" under the AKS.

56.     The AKS provides that "a person need not have actual knowledge of this section or specific intent to commit a violation of this section." *Id.* § 1320a-7b(h).

57.     Referrals or recommendations need not be the sole or primary purpose of a kickback for a violation of the AKS. Instead, courts consider ***"whether at least one purpose of the payment could be to induce or reward the referral or recommendation of business payable in whole or in part by a federal health care program***." *Guilfoile v. Shields,* 913 F.3d 178, 189 (1st Cir. 2019).

58.     In 2010, Congress reiterated the centrality of the AKS to a claims payment decision by amending the AKS to provide that any "***claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]***." 42 U.S.C. § 1320a-7b(g). Accordingly, claims submitted to federal health care programs that result from violations of the AKS are *per se* false or fraudulent within the meaning of 31 U.S.C. § 3729(a).

59.     In addition to proving that a claim "includes items or services resulting from a violation [of the AKS]," 42 U.S.C. § 1320a-7b(g), a second and distinct "pathway to FCA liability for an AKS violation [exists] when someone falsely represents compliance with a material requirement that there be no AKS violation in connection with the claim." *United States v. Regeneron Pharms., Inc.,* 128 F.4th 324,333 (1st Cir. 2025) (citing *United States ex rel. Hutcheson v. Blackstone Med., Inc.,* 647 F.3d 377, 392-94 (1st Cir. 2011)).

60.     Even without an express representation of compliance, one can be liable under the FCA if one "makes specific representations about the goods or services provided" but "fail[s] to disclose noncompliance with material statutory, regulatory, or contractual requirements" in a way that "makes those representations misleading half-truths." *Universal Health Servs., Inc. v. United*

*States,* 579 U.S. 176, 190 (2016).

### 3.    Federal Regulations Regarding The False Claims Act

61.    The False Claims Act was enacted to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266. The FCA broadly creates liability for "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.,* 390 U.S. 228, 232 (1968).

62.    The FCA provides, in pertinent part, that any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material[34] to a false or fraudulent claim; [or] (C) *conspires to commit a violation of subparagraph (A) [or] (B)*" is liable to the United States Government for damages and penalties. 31 U.S.C. § 3729(a)(l).

63.    The FCA defines "knowingly" to include "actual knowledge of the information," as well as actions taken in "deliberate ignorance of the truth or falsity of the information" or in "reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(l)(A). "No proof of specific intent to defraud" is required to establish liability. *Id.* § 3729(b)(1)(B).

64.    The FCA defines a "claim" to mean:

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government-

---

[34]    The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

*Id.* § 3729(b)(2).

G. **Contrary To SelectQuote's Legal Obligations And "Unbiased" Business Model, SelectQuote Directed Medicare Beneficiaries To Plans Offered By Insurers That Paid Them For That Purpose, Regardless Of Their Suitability**

65.    Unbeknownst to investors, contrary to SelectQuote's legal obligations and its emphatic touting of an "unbiased" business model and dedication to agents "trained to offer unbiased advice," SelectQuote "repeatedly directed Medicare beneficiaries to the plans offered by insurers that paid them the most money, regardless of the quality or suitability of the insurers' plans."[35]  These activities also included "reducing or limiting the proportion of persons with disabilities" that the Company directed toward insurers which paid them, because those insurers "perceived Medicare beneficiaries with disabilities to be more costly and less profitable than beneficiaries who were eligible for Medicare due to age.[36]  Specifically, through "***at least 2021***," as the Department of Justice would later allege, SelectQuote was paid kickbacks by, at minimum, Humana and Aetna, in violation of Federal Law.[37]

66.    As set out in greater detail below, the Company executed its scheme in coordination with Humana and Aetna. Certain of these activities began prior to the Class Period, but persisted into, and through, *at least* 2021.

67.    Beginning in 2016 through *at least* 2021, SelectQuote knowingly and willfully

---

[35]    DOJ Complaint at 1.

[36]    DOJ Complaint ¶101.

[37]    DOJ Complaint ¶98.

solicited and received kickbacks from insurance providers Humana and Aetna.[38] Specifically, SelectQuote received millions of dollars of "market development funds" (or "MDF") from Humana and Aetna in exchange for extra-contractual commitments to sell specific quantities of Medicare Advantage policies. These insurance companies intended, and SelectQuote understood, this money was not only to induce the SelectQuote to steer Medicare beneficiaries to paying insurer's plans, but also to "box out" competing carriers so that the brokers would not recommend those carriers' plans.[39]

68.    These kickback payments were in addition to, and separate from, permissible per-enrollment compensation (*e.g.*, commissions) that the insurers paid to SelectQuote.[40] SelectQuote generally understood that most insurers were willing to pay the maximum compensation permitted by CMS for each enrollment in their plans, so making those payments did not distinguish an insurer or incentivize brokers to steer beneficiaries to that insurer's plans. Therefore, SelectQuote accepted greater, illicit payments in addition to the permitted (but capped) commissions, from insurers  in order to influence the market.[41]

69.    Humana in particular received preferential enrollment treatment from the SelectQuote based on these kickbacks, including by establishing "pods" or "teams" of agents  who either only sold Humana plans or received extra remuneration for selling Humana's plans (as opposed to its primary multi-carrier platform).[42]

---

[38]    DOJ Complaint ¶98-99.

[39]    DOJ Complaint ¶98-99.

[40]    DOJ Complaint ¶100.

[41]    DOJ Complaint ¶100.

[42]    DOJ Complaint ¶109.

70.     Specifically, beginning in 2016, SelectQuote established a "pod" of SelectQuote agents who would focus on selling only Humana policies, starting with fifteen and growing to thirty-five agents.  In March 2016, SelectQuote projected that these exclusive agents would sell 7,049 Humana policies in 2016 that SelectQuote otherwise would not have sold.[43]   As Robin Reece, Humana's National Sales Director for External Distribution subsequently summarized SelectQuote's proposal: "They are asking for $316,525 in ROY [rest of year] for an additional of 1,151 MA sales at a $275 CPS [cost per sale]. Their ask for AEP[44] is $1.3 million for an additional 5,898 MA sales at a $225 CPS."[45]

71.     As Evan Mohl, Humana's Vice President of Strategy and Sales Channel Development Lead, explained in a text message to his manager, Humana began "deploying co op in 2017 to create pods (semi exclusivity) to scale [Medicare Advantage] growth in a challenged product year."  That is, as Mohl and others at Humana recognized, these kickbacks were being paid to SelectQuote to induce sales of Humana plans, even where those plans (or "products") were weaker than competitors' plans.

72.     In another example, a Humana employee explained that, without certain purported marketing payments to SelectQuote—some of which were paid to create and reward a "pod" of agents who sold only Humana plans—Humana's market share from SelectQuote "would look more like 30% total. The pod allows us to be at 47% total [of SelectQuote's sales]."[46]

73.     As set out in more detail below, SelectQuote even established a wholly owned

---

[43]     DOJ Complaint ¶203.

[44]     AEP refers to Annual Enrollment Period, the yearly window during which Medicare beneficiaries can review and change their healthcare and prescription drug coverage plans.

[45]     DOJ Complaint ¶203.

[46]     DOJ Complaint ¶110.

subsidiary called Tiburon Insurance Services ("Tiburon") to operate its exclusive pod of agents for Humana. The DOJ's investigation found that "but for the kickbacks that induced SelectQuote to establish the Tiburon pod of Humana-exclusive agents, approximately seventy-four percent of the Tiburon sales would have gone to other carriers."[47]

74.    SelectQuote was deeply aware of the importance pods played in servicing kickbacks. In December 2016, as SelectQuote's then-President, Tom Grant, explained to Humana's National Director of Sales Robin Reece and Humana National Sales Manager Megan Kute, if SelectQuote had shifted its agents from the Tiburon pod, where nearly all of their sales were Humana, back to SelectQuote's main multi-carrier platform, Humana would have received only about twenty-six percent of those agents' sales.[48] "In other words, but for the kickbacks that induced SelectQuote to establish the Tiburon pod of Humana-exclusive agents, approximately seventy-four percent of the Tiburon sales would have gone to other carriers. SelectQuote and Humana did not mention the Tiburon pod in their contracts, however."[49]

75.    Importantly, SelectQuote routed calls of Medicare beneficiaries to pods of exclusive agents, who only sold a single provider's plans, ***without telling beneficiaries***, despite claiming to offer unbiased advice.[50]

76.    In addition to the use of "pods," SelectQuote used call routing techniques to ensure that the needs of insurers paying kickbacks were prioritized over those of the beneficiary by using lead scoring and "dynamic" lead routing tactics for calls coming from Medicare beneficiaries.[51]

---

[47]    DOJ Complaint ¶209.

[48]    DOJ Complaint ¶209.

[49]    *Ibid.*

[50]    DOJ Complaint ¶¶229, 445.

[51]    DOJ Complaint ¶445.

SelectQuote made "call routing changes" based both on call volume and the Company's relationships with the insurer, including "tiering of [certain] calls" based on "large discrepancies in value" to SelectQuote. SelectQuote also worked to "identify which leads have a higher . . . propensity" for picking certain insurance providers.[52]

77.     Customers were not informed of these routing practices. For example, on July 23, 2018, Sarah Anderson, a SelectQuote Director of Marketing, wrote to her colleagues, including Bob Grant and Josh Matthews, that "[i]n AEP 2018 we have a target of achieving 24K Humana policies from October 1st - December 31st to achieve a significant bonus," meaning the so-called "marketing" funding.[53] Ms. Anderson also provided a list of enrollment-related "actions" SelectQuote could take to achieve this "bonus."[54] Among those actions was to route certain calls to SelectQuote's Humana-exclusive agents.[55] Beneficiaries would not be told about this routing.[56]

78.     Further undermining their claims of "unbiased" shopping, SelectQuote built "suppression tools" that removed competing insurers from its internal quoting tool for agents.[57] These tools allowed the Company to turn 'off' and 'on' certain insurers from its internal recommendations, based on the kickbacks paid to them.[58] According to the DOJ, SelectQuote acknowledged internally that it had "buil[t] out suppression tools," which could make certain

---

[52]     DOJ Complaint ¶66.

[53]     DOJ Complaint ¶229.

[54]     *Ibid.*

[55]     *Ibid.*

[56]     *Ibid.*

[57]     DOJ Complaint ¶200.

[58]     DOJ Complaint ¶¶200, 764.

providers or plans "not show in certain states or all together," without regard for the best interests of beneficiaries reaching out to SelectQuote.[59]

79.    As internal SelectQuote communications cited in the DOJ Complaint show, SelectQuote took these actions knowing that the insurers intended their remuneration to be consideration for enrollments and for preferential treatment and that this violated State and Federal law.   And irrespective of the legality of these payments, SelectQuote's conduct in steering beneficiaries to its kickback partners vitiated beneficiary choice and violated SelectQuote's professed commitment to providing beneficiaries with "unbiased" coverage comparisons.

### 1.    SelectQuote and Humana

80.    Prior to and during the Class period through at least 2021, Humana agreed to pay and did pay millions of dollars in kickbacks to SelectQuote under the guise of "marketing" funds, when, in reality, payments were conditioned on (1) SelectQuote delivering specific quantities of Medicare Advantage enrollments for Humana, (2) SelectQuote maintaining a "pod" of agents that sold only Humana policies, and (3) SelectQuote steering a substantial share of its remaining business to Humana through its other "multi-carrier" agents.[60]

81.    SelectQuote and Humana first entered into a broker agreement in or around 2015. From 2016 through at least 2021, SelectQuote knowingly and willfully solicited and received kickbacks from Humana, which paid SelectQuote millions of dollars of "market development funds" (or "MDF") in exchange for extra-contractual commitments to sell specific quantities of Humana Medicare Advantage policies. Humana intended, and SelectQuote understood, that this money was not only to induce the SelectQuote to steer Medicare beneficiaries to Humana plans,

---

[59]    DOJ Complaint ¶764.

[60]    DOJ Complaint ¶199.

but also to "box out" competing carriers so that the brokers would not recommend those carriers' plans.[61]

82.    These kickback payments were in addition to, and separate from, permissible per-enrollment compensation (*e.g.*, commissions) that the insurers paid to SelectQuote. SelectQuote generally understood that most insurers were willing to pay the maximum compensation permitted by CMS for each enrollment in their plans, so making those payments did not distinguish an insurer or incentivize brokers to steer beneficiaries to that insurer's plans. Therefore, SelectQuote accepted greater, illicit payments in addition to the permitted (but capped) commissions, from insurers in order to influence the market.[62]

83.    Further, from 2016 through at least 2021, Humana further conditioned some of their kickbacks on SelectQuote reducing or limiting the proportion of persons with disabilities that the brokers enrolled in their plans because they perceived Medicare beneficiaries with disabilities to be more costly and less profitable than beneficiaries who were eligible for Medicare due to age.[63]

84.    SelectQuote's relationship with Humana was especially close. In July 2016, SelectQuote established a wholly owned subsidiary called Tiburon to operate its exclusive pod of

---

[61]    DOJ Complaint ¶98-99.

[62]    DOJ Complaint ¶100.

[63]    DOJ Complaint ¶101. For example, on or around July 26, 2017, SelectQuote's President of the Senior Division, Josh Matthews emailed Humana National Sales Manager Megan Kute, stating:

> Humana reiterated the desire to have SelectQuote's book of under 65 business below 40 percent. Following that meeting, we relaunched the target marketing efforts and began the process of lowering our under 65 book with Humana .... Our plans moving forward into AEP this year will be to fine tune the target marketing efforts and continue to drive the appropriate levels and types of business that our partners desire."

DOJ Complaint ¶369.

agents for Humana.  Tiburon was a separate company that sold a smaller number of insurers' plans than SelectQuote did through its multi-carrier platform.  The separation between Tiburon and SelectQuote was a pretense, however.  SelectQuote executives decided which insurers' plans Tiburon agents would sell and approve Tiburon agents' compensation.  However, Tiburon did not have a single contract with the insurance companies—the relevant contracts were with SelectQuote.  SelectQuote simply used Tiburon to steer beneficiaries to plans offered by the insurers willing to pay SelectQuote sufficient remuneration.[64]

85.     From 2016 to 2018, the Tiburon pod sold only Humana plans; from 2019 onwards select other insurers who paid kickbacks were added to the Tiburon Pod.[65]  Despite this, agents in the pod did not clearly inform beneficiaries of this steering conduct.  As SelectQuote's then Senior Vice President, Paul Gregory, explained: "We do not use the Humana brand. We answer the phone as Tiburon."[66]

86.     SelectQuote trained Tiburon agents to "think eat sleep and be Humana" and to "[t]ransfer [to SelectQuote's multi-carrier agents] as a last resort."[67]  Consistent with this training, SelectQuote paid Tiburon agents much more to sell a Humana Medicare Advantage plan than to transfer a caller to a multi-carrier agent who might have been able to offer a more suitable plan option.  And SelectQuote disciplined Tiburon agents if they transferred too many beneficiaries to the multi-carrier "Choice" agents.[68]

---

[64]     DOJ Complaint ¶205

[65]     DOJ Complaint ¶242

[66]     DOJ Complaint ¶206

[67]     DOJ Complaint ¶211

[68]     *Ibid.*

87.    Tiburon's exclusive sale of Humana plans, without adequate notice to beneficiaries, vitiated beneficiary choice.  Internally, Humana recognized that its sham "marketing dollars" would generate situations where "only Humana will be offered" by SelectQuote, regardless of the needs of a beneficiary.  As Craig Uchytil, Humana's Sales Vice President expressed, "I do not want to put money towards the non-exclusive area .... I want to use the dollars to drive additional calls into the exclusive call center," meaning the Tiburon "pod" of agents.[69]  Nevertheless, the contracts between the parties referred only to "targeted marketing campaign[s]" and generation of "leads."[70]

88.    These activities continued into the Class Period. Specifically, throughout 2020, Humana paid SelectQuote a total of approximately $18.7 million in purported marketing funding.[71] The parties then signed contracts that ostensibly provided for Humana to pay SelectQuote in exchange for a "targeted marketing campaign." In reality, these funds were intended as remuneration in consideration for enrollments and preferential treatment, in violation of state and Federal law.[72]  In return for the payments, SelectQuote both promised to and did take specific actions to steer Medicare enrollments to Humana even if the service was inferior.[73]

89.    For example, on October 26, 2020, Humana's Vice President of Strategy and Sales, Evan Mohl told his colleagues that Humana used its alleged marketing funding to:

maintain[] several [relationships with brokers] that are semi-exclusive or preferential, which has worked to our advantage to ensure *we earn more than our*

---

[69]     DOJ Complaint ¶213.

[70]     DOJ Complaint ¶214.

[71]     DOJ Complaint ¶243.

[72]     DOJ Complaint ¶247-8.

[73]     DOJ Complaint ¶200.

***fair share of sales*** while driving down CPS [cost per sale].  ***For example, without SelectQuote exclusive pod of agents, we would not be their No. 1 carrier.*** [74]

90.      SelectQuote and Humana's scheme continued into 2021. In 2021, Humana paid SelectQuote approximately $29.5 million in purported marketing funding.[75]  On January 13, 2021, according to the DOJ, Robin Reece, Humana's National Sales Director for External Distribution, told her colleagues that, separate and apart from other agreements in December 2020, Humana had the following understanding with SelectQuote for the first three quarters of the year: "Ql CY21 - 47,000 sales ($7,050,000)[,] Q2 CY21 - 25,250 sales ($3,787,500)[,] Q3 CY21 - 26,250 sales ($3,937,500)."[76]

91.      According to the DOJ, following several other agreements in the year, on September 1, 2021, Humana agreed to pay SelectQuote $10 million, allegedly for "a targeted marketing campaign between October 1, 2021 and December 7, 2021" that would "include the purchase and use of leads."[77]  On top of this agreement, SelectQuote offered Humana the chance to pay larger kickbacks in exchange for more enrollments into Humana's Medicare Advantage plans. *Ibid*.

92.      Although SelectQuote reported that Humana's kickback payments were "market development funds," in reality, these funds were intended as remuneration in consideration for enrollments and preferential treatment, in violation of state and Federal law, because in return for the payments, SelectQuote both promised to and did take specific actions to steer Medicare

---

[74]      DOJ Complaint ¶¶247-8.

[75]      DOJ Complaint ¶251.

[76]      DOJ Complaint ¶252.

[77]      DOJ Complaint ¶254-5.

enrollments to Humana.[78]   Thus, SelectQuote and Humana maintained an artifice of contracting for "leads" but negotiating about, and paying for, enrollments.[79]

93.    These facts are revealed by internal documents cited by the DOJ.  For example, on July 14, 2021, Joshua Kopmeyer, a SelectQuote Executive Vice President, asked a colleague in SelectQuote's finance department to:

> "please create an invoice for us to send to Humana.  They do NOT want a timeframe (I can explain this offline) but the invoice should be for $1,860,000 and the number of leads we can generate for this amount of $ - should be roughly 150K for leads."

*Ibid*. Kopmeyer added that "this is for 12,400 submissions . . . . incremental to our current AEP commitment of 70K."[80]  The written agreement for $1,860,000, effectuated about a month later, made no mention of incremental submissions or enrollments.[81]  Nor would it, given that the Company was not, in fact, receiving funds for marketing goals over a certain period, but was directly exchanging payments for enrollments, regardless of the needs of beneficiaries

94.    In another example, on October 20, 2021, Joshua Kopmeyer, a SelectQuote Executive Vice President, proposed to Megan Kute, a Humana National Sales Manager, that "for an investment of $500K we could commit an incremental ~2,500+ enrollments."[82]  Following negotiation of these figures, Laura Bourdelais, a SelectQuote Senior Account Manager, reported to her colleagues that "Humana is paying us an additional $500,000 in MDF for an additional 3,500 submissions," on top of prior enrollment commitments.[83]

---

[78]    DOJ Complaint ¶200.

[79]    DOJ Complaint ¶253.

[80]    *Ibid.*

[81]    *Ibid*.

[82]    DOJ Complaint ¶255.

[83]    DOJ Complaint ¶256.

### 2.    SelectQuote and Aetna

95.    SelectQuote's relationship with Humana was by no means the exception. Beginning in the fall of 2017, Aetna paid SelectQuote kickbacks disguised as "marketing" money to induce SelectQuote to steer business to Aetna.  In return for "marketing" money, SelectQuote did just that.[84]

96.    In April 2017, before Aetna had agreed to pay SelectQuote any "marketing" money, SelectQuote temporarily "paused" Aetna on its platform.  SelectQuote cited, among other reasons, "customer level persistency issues that are outside of our locus of control."[85]  On October 12, 2017, however, SelectQuote sent its first "marketing" invoice to Aetna for $120,000 and set a "Target of 3,000 [Aetna] Policies During AEP."  SelectQuote immediately resumed selling Aetna policies in certain states.[86]

97.    Though Aetna began paying "marketing" funding to SelectQuote in the fall of 2017, and SelectQuote started selling Aetna Medicare Advantage plans again, the parties did not enter into a written contract until July 2020.[87]  As SelectQuote's President of the Senior Division, Josh Matthews would later explain in an August 2021 telephone call, "five years ago you did these deals, small handshake deals in dark back rooms."[88]

98.    SelectQuote had many tools by which it accomplished steering in return for "marketing" money from Aetna.  For instance, on November 2, 2017, Brian Wright (a SelectQuote Senior Operations Analyst) touted to a colleague the deployment of a new feature in SelectQuote's

---

[84]    DOJ Complaint ¶421.

[85]    DOJ Complaint ¶422.

[86]    DOJ Complaint ¶423.

[87]    DOJ Complaint ¶424.

[88]    *Ibid.*

"Quote Engine" to "***suppress MA [Medicare Advantage] and PDP [Prescription Drug Plan] carriers at a state level***."  Brian Wright explained that "[w]e'll be able to turn plans off whenever we want to[.]"[89]

99.     These activities continued into the Class Period.

100.     In 2020, Aetna paid SelectQuote nearly $4.9 million in "Market Development Funding."[90]  In reality, these funds were intended as remuneration in consideration for enrollments and preferential treatment, in violation of state and Federal law.[91]  In return for the payments, SelectQuote both promised to and did take specific actions to steer Medicare enrollments to Aetna. For example, by 2020, Aetna was added to the Tiburon pod.[92]

101.     Aetna also offered and paid SelectQuote bonuses, rewards, and kickers—all under the guise of "marketing" funding to incentivize Medicare Advantage sales in specific geographic regions.[93]  SelectQuote understood the kicker money to be a "bonus" on top of the exceeded statutory cap, and that its reporting would therefore have to be manipulated.[94]  For example, on November 9, 2020, after receiving notice of a "kicker" reward for the Heartland/Midlands region, SelectQuote's Director of Carrier and Strategic Partnerships Laura Bourdelais asked Aetna National Sales Director Amy Ike if the kicker money would "be paid via increased MDF[95] or production bonus revenue?"  Ike responded that "[i]t will be paid separate from MDF."[96]

---

[89]     DOJ Complaint ¶425.

[90]     DOJ Complaint ¶451.

[91]     DOJ Complaint ¶247-8.

[92]     DOJ Complaint ¶453.

[93]     DOJ Complaint ¶468.

[94]     DOJ Complaint ¶479.

[95]     Market development funds.

[96]     DOJ Complaint ¶479.

102.    These activities continued into 2021. In 2021, Aetna paid SelectQuote approximately $7.4 million in "marketing" money.[97]  In return, SelectQuote continued to steer Medicare enrollments to Aetna, regardless of the suitability of the plan.  Internal DOJ documents cited in the DOJ Complaint bear this causal relationship out.

103.    For example, when Aetna dropped its payments to $200 per policy for the 2021 Annual Enrollment Period (in the fall of 2020), SelectQuote limited its steering to Aetna plans.[98] According to an email from Ron Maurno, SelectQuote's Director of Medicare Sales, to Josh Matthews, SelectQuote's Executive Vice President of Medicare Sales and Operations, on April 6, 2021, this was a direct response: "[f]or Tiburon Pod, Aetna was dropped to 'Priority 4' and only paid at 50% commission for this past AEP."[99]  Aetna's market share on the SelectQuote sales platform was just 9.8 percent in the last quarter of 2020, compared to 15.9 percent during the same period a year earlier.  *Ibid.*

104.    Well into 2021, SelectQuote made clear that it was exchanging kickbacks for steering customers to Aetna, regardless of beneficiary need.  For instance, on May 11, 2021, Joshua Kopmeyer, SelectQuote's Executive Vice President, sent John Sowell, Aetna's Executive Director of the Strategic Sales Channel, a lengthy email with a veiled threat to reduce sales of Aetna policies if Aetna did not increase its payments to SelectQuote:

> "With Aetna either paying less or not participating in ways that help our LTVs [lifetime values], it currently has the lowest LTV of all of our key carrier partners. Not only that, there are meaningful deltas between Aetna and its competitors. This puts pressure on [SelectQuote] to maintain and grow Aetna's market share; in fact, being financial stewards of the company would drive opposite behavior."[100]

---

[97]    DOJ Complaint ¶456.

[98]    DOJ Complaint ¶455.

[99]    DOJ Complaint ¶455.

[100]    DOJ Complaint ¶457.

105.    SelectQuote's brokers also received from Aetna certain "switching" fees, including "a minimum one time $200 marketing fee" to induce the switch to another Aetna plan rather than to another carrier's plan despite Federal law prohibiting such activities, in and around November 2021.[101]  As John Sowell, Aetna's Executive Director of the Strategic Sales Channel, explained in sworn testimony cited in the DOJ Complaint that it was brokers, including SelectQuote, who solicited "switching" fees, under the guise of marketing.   In fact, Sowell specifically remembered SelectQuote telling Aetna that other MAOs were paying such remuneration.[102]

106.    Further, during the Class Period until *at least* 2021, SelectQuote conspired with Aetna to limit the proportion of beneficiaries with disabilities enrolled in Aetna Medicare Advantage plans, in violation of federal law.[103]  In order to limit the number and percentage of disabled beneficiaries enrolled in its plans, Aetna not only conditioned the SelectQuote's "marketing" funding on the *number* of beneficiaries the brokers enrolled in Aetna Medicare Advantage plans, but also on the *type* of Medicare beneficiary that it enrolled in Aetna Medicare Advantage plans.[104]  Aetna set goals for brokers like SelectQuote to ensure that the number of disabled Medicare beneficiaries did not exceed a certain percentage of beneficiaries enrolled in Aetna Medicare Advantage plans and told them that it would not pay "marketing" money if the ratio of disabled to non-disabled beneficiaries was higher than what Aetna deemed acceptable.[105]

---

[101]    DOJ Complaint ¶481.

[102]    DOJ Complaint ¶482.

[103]    DOJ Complaint ¶484.

[104]    DOJ Complaint ¶489

[105]    DOJ Complaint ¶489.

H.    **SelectQuote Understood That Its Kickback Arrangements And Resulting Preferences For Paying Insurers Caused Problems For Beneficiaries**

107.    Defendants understood that SelectQuote's kickback arrangements—and resulting preferences for paying insurers—caused problems for beneficiaries.  For example, SelectQuote received millions of dollars in payments from an insurer (Wellcare) in exchange for a group of SelectQuote agents focused on selling that insurer's plans.  But this program, called "Wellcare Direct," led to "higher CTMs and disenrollment rates" than SelectQuote's general sales model, including "33% higher" complaints in one period.[106]

108.    A SelectQuote Senior Director of Sales Operations, Jack Sieger ("Sieger"), candidly explained "the root cause of the issue from my perspective":

> Choice Agents only sell WellCare when it is the best plan for the client, while WCD [*i.e.*, Wellcare Direct] sells *WC even if UHC or anyone else have a plan that better fits the clients [sic] needs.*  While this doesn't explain 'founded' CTM complaints[] it can increase overall CTM's as clients will use CTM complaints to attempt to return to a prior or new plan. [107]

109.    Kopmeyer forwarded Sieger's message to a colleague, stating simply that "We don't want to say this."[108]  As a SelectQuote Senior Sales Director explained, "From what I understand the economics make since [sic] for us to do this since it is an upfront cash grab."[109]

110.    SelectQuote also acknowledged internally that it had "buil[t] out suppression tools," which could make certain MAOs or plans "not show in certain states or all together," without regard for the best interests of beneficiaries reaching out to SelectQuote.[110]

---

[106]    DOJ Complaint ¶761.  CTMs are complaints tracked through CMS's "Complaints Tracking Module.  DOJ Complaint ¶50.

[107]    DOJ Complaint ¶762.

[108]    DOJ Complaint ¶762.

[109]    DOJ Complaint ¶763.

[110]    DOJ Complaint ¶764

### I.    Former Employees Corroborate Key Elements Of The DOJ's Allegations

#### 1.    Former Employee Corroborate That SelectQuote Received Bonuses Beyond The Standard Commission Schedule

111.    FE1[111] confirmed that he understood that "there were some rewards or bonuses provided by carriers." FE1 claimed to have seen rewards or bonuses provided by carriers in "upper leadership reports," which sometimes stated that "X amount had come through in bonuses, beyond our standard commission schedule." FE1 recalled that he had found these bonuses suspicious. FE1 explained that these reports appeared in pivot tables containing itemized information, including the health insurance company, and the dollar amount SelectQuote received from them. They were shared "sporadically"; FE1 estimated that they came through twice a quarter, on the occasion of an agreement reached between SelectQuote and health insurance companies. FE1 recalled that these payments came from Humana and Aetna. The reported business-to-business payments were called "company bonuses," and FE1 specified that they were distributed among salespeople as "accelerator" payments. These were intended to "boost their motivation" to sell plans from the company paying the bonus.[112]

#### 2.    Former Employees Corroborate That The Company Maintained Pods Which Sold Only Select Plans

112.    During his tenure, FE2 observed that the company was able to manipulate a large number of enrollments by creating dedicated teams that sold only one carrier's plans.[113] According

---

[111]    FE1 reported first to Maurno, former senior director of sales, and later to Sieger, former senior director of sales operations.

[112]    FE1 recalled one meeting in September/October of 2021 in which former CFO and Defendant Sadun mentioned one of these reports. FE1 described the occasion as a "kickoff" meeting, in which managers received instructions regarding salespeople in the Tiburon pod. He mentioned that most of the sales related to these payments would have come from annual enrollment period (AEP) sales.

[113]    FE2 he had been pulled into "a couple of special campaigns."   .

to FE2, the Company does not tell its agents, "We need you to sell more Aetna," for example. Rather, it operates in a way that agents "can only sell Aetna." FE2 commented that, although the Company tells its salesforce that it is "carrier agnostic," "we knew they weren't."

### 3. Former Employees Corroborate That The Company Internal Quoting Tools Could Be Used As Suppression Tools

113. FE3 described how the company used a call routing software system called Five9. He spoke at length about the Company's scripts, and the increasing emphasis, during his tenure, on agents adhering strictly to scripts. Per FE3, agents were trained to use scripts that did not fully inform customers of the details of their plans, or the advantages of others.

114. FE2 mentioned the company's proprietary "quote engine," which he claimed was able to strategically limit the plans agents were able to view or access, as they prepared quotes for potential clients.

### J. The Truth Emerges When The DOJ Intervenes In An Action Against The Nation's Largest Insurance Companies And Three Large Brokers, Revealing The Scope And Extent Of SelectQuote's Illegal Activities

115. On May 1, 2025, at approximately noon eastern standard time, the DOJ announced that it had filed the DOJ Complaint, revealing the truth that "[f]rom 2016 through *at least* 2021" SelectQuote received "tens of millions of dollars" in "illegal kickbacks" from health insurance companies in exchange for steering Medicare beneficiaries to enroll in the insurers' plans. The DOJ Complaint revealed that SelectQuote made materially false claims by stating it offers "unbiased coverage comparisons" when in fact it "*repeatedly directed Medicare beneficiaries to the plans offered by insurers that paid them the most money, regardless of the quality or suitability of the insurers' plans*."[114] The DOJ also revealed the financial arrangements between

---

[114]    DOJ Complaint at 1.

SelectQuote and insurers were falsely or misleadingly reported as "marketing" fees.

116.    On this news, SelectQuote's stock price fell $0.61, or 19.2%, to close at $2.56 per share on May 1, 2025, on unusually heavy trading volume.

## V.    DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS

### A.    The Company's Statements About Providing Unbiased Advice

#### 1.    Statements Concerning FY 2020

117.    On September 9, 2020, SelectQuote reported its financial results for the fourth quarter and full fiscal year ending on June 30, 2020 (the "FY20 PR").  The FY20 PR was filed with the SEC on the same date as Exhibit 99.1 to a Form 8-K signed by Defendant Sadun.  The FY20 PR stated the Company's business model is based on "providing unbiased comparisons" to allow "consumers to choose the policy and terms that best meet their unique needs."  Specifically, the FY20 PR stated as follows in relevant part:

> The company pioneered the direct-to-consumer **model of providing unbiased comparisons** from multiple, highly-rated insurance companies **allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success:** a force of more than 1,000 highly-trained and skilled **agents who provide a consultative needs analysis for every consumer,** and **proprietary technology that sources, scores, and routes high-quality sales leads.**

118.    The statements in ¶117 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a)    Between 2016 and 2020, SelectQuote steered beneficiaries into Medicare Advantage and Medicate Supplement insurance plans offered by insurers who paid kickbacks to SelectQuote, without the beneficiaries' knowledge and regardless of the quality or suitability of the insurers' plans to the beneficiaries' individual needs;

(b)    SelectQuote's steering techniques included the use of "pods" of agents who exclusively (or preferentially) sold the Medicare Advantage and Medicare Supplement insurance plans of insurers who paid kickbacks to SelectQuote;

(c)    SelectQuote set up subsidiaries (including Tiburon) which did not offer unbiased advice aligned to the specific needs of each customer but instead consisted of exclusive (or semi-exclusive) agents posing as unbiased agents;

(d)    SelectQuote used "suppression tools" to remove competing insurers from its internal quoting tool for agents in order to favor insurers who had paid kickbacks, without regard for the best interests of beneficiaries;

(e)    SelectQuote's use of these steering techniques in return for kickbacks violated state and federal laws and regulations, exposing SelectQuote and its officers to potential civil and criminal liability and severe reputational damage; and

(f)    Irrespective of whether SelectQuote's steering practices independently violated state or federal laws or regulations, these practices were inconsistent with SelectQuote's promise of providing "unbiased comparisons."

119.    On September 10, 2020, SelectQuote submitted its annual report for the fiscal year ending on June 30, 2020 on a Form 10-K filed with the SEC (the "FY20 10-K"). The FY20 10-K was signed by Defendants Danker and Sadun. The FY20 10-K stated the Company provides "***unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans.***" Specifically, the FY20 10-K stated as follows in relevant part:

> SelectQuote Senior ("Senior"), our fastest growing and largest segment, was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***

120.    The statements in ¶119 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same

reasons set forth above in ¶118 with respect to the statements in ¶117, that is, the failure to disclose the material facts identified in ¶118(a)-(f) rendered the statements  materially misleading.

121.    The FY20 10-K also stated the Company's "***agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer***."  Specifically, the FY20 10-K stated as follows in relevant part:

> We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. ***Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.***

122.    The statements in ¶121 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶118 with respect to the statements in ¶117, that is, the failure to disclose the material facts identified in ¶118(a)-(f) rendered the statements materially misleading.

123.    On September 9, 2020, the Company hosted an earnings call pursuant to its fourth quarter and full year financial results (the "FY20 EC"). Defendants Danker, Sadan and Grant participated in the FY20 EC. During the FY20 EC, Defendant Danker touted the Company's purported "***differentiated operational processes***" including its alleged "***mission agnostic agent lead model***" which he stated was "***the best way to achieve the best outcome for our customers***." Specifically, during the FY20 EC Defendant Danker stated as follows, in relevant part:

> SelectQuote ended the fourth quarter with consolidated revenues of $141 million, up 90% year-over-year, and adjusted EBITDA of $40 million, up 106% year-over-year. Both were ahead of our internal expectations, and represent the continued strength in both our Senior and Life Divisions, which we will detail in a minute. On a consolidated basis, we reported net income of $20 million, or diluted earnings per share of $0.13. This dramatic growth reflects not only the very large growth opportunity in the Senior market, but also the ***differentiated operational processes we had built into our model*** over the last 35 years that have ***enabled us to take advantage of this opportunity.*** We're going to spend some time talking to those differentiators today as well.

*       *       *

> Turning to the right side of the page, we also firmly believe that our highly trained and 100% in-house agent workforce is a key differentiating asset for SelectQuote. The complexity and deciding upon an insurance policy is daunting for most people, and the stakes pertaining to details like physician networks and prescription drugs can prove costly. We believe our ***internal mission agnostic agent lead model is the best way to achieve the best outcome for our customers*** and simultaneously maximize the return SelectQuote earns on acquiring that same policyholder.

124. The statements in ¶123 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶118 with respect to the statements in ¶117, that is, the failure to disclose the material facts identified in ¶118(a)-(f) rendered the statements materially misleading. In addition, the statements in ¶123 were materially false and/or misleading because SelectQuote's steering of customers to insurance companies paying kickbacks means the Company did not have a "agnostic agent lead model" as agents were not agnostic, they were induced by kickbacks. Further, the Company's "differentiated operational processes" did not put the needs of the customers first; it instead narrowed customer options and pushed them toward plans by the companies who paid SelectQuote the most money.

### 2. Statements Concerning FY 2021 And Interim Periods Within FY 2021

125. On November 5, 2020, SelectQuote reported its financial results for the first quarter of fiscal year 2021 ending on September 30, 2020 (the "1Q21 PR"). The 1Q21 PR stated, in relevant part:

> The company pioneered the direct-to-consumer ***model of providing unbiased comparisons*** from multiple, highly-rated insurance companies ***allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success:*** a force of more than 1,000 highly-trained and skilled ***agents who provide a consultative needs analysis for every consumer,*** and ***proprietary technology that sources, scores, and routes high-quality sales leads.***

126.    On February 8, 2021, SelectQuote, Inc. reported its financial results for the second quarter ended December 31, 2020 (the "2Q21 PR"). The 2Q21 PR stated, in relevant part:

> The company pioneered the direct-to-consumer **model of providing unbiased comparisons** from multiple, highly-rated insurance companies **allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success**: a strong force of highly-trained and skilled **agents who provide a consultative needs analysis for every consumer**, and **proprietary technology that sources, scores, and routes high-quality sales leads.**

127.    These statements were repeated verbatim in SelectQuote's press releases reporting: financial results for the third quarter ending on March 31, 2021 (the "3Q21 PR"); and financial results for the fourth quarter and full fiscal year ending on June 30, 2021 (the "FY21 PR"). Collectively, the 1Q21 PR, 2Q21 PR, 3Q21 PR, and FY21 PR are referred to as the "2021 Press Releases."[115]

128.    The statements made in the 2021 Press Releases identified in ¶125, ¶126, and ¶127 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a)    Between 2016 and 2021, SelectQuote steered beneficiaries into Medicare Advantage and Medicate Supplement insurance plans offered by insurers who paid kickbacks to SelectQuote, without the beneficiaries' knowledge and regardless of the quality or suitability of the insurers' plans to the beneficiaries' individual needs;

---

[115]    The 1Q21 PR was filed with the SEC on November 5, 2020 as Exhibit 99.1 to a Form 8-K signed by Defendant Sadun.  The 2Q21 PR was filed with the SEC on February 8, 2021 as Exhibit 99.1 to a Form 8-K signed by Defendant Sadun.  The 3Q21 PR was filed with the SEC on May 11, 2021 as Exhibit 99.1 to a Form 8-K signed by Defendant Sadun.  The FY21 PR was filed with the SEC on August 25, 2021 as Exhibit 99.1 to a Form 8-K signed by Defendant Sadun.

(b)    SelectQuote's steering techniques included the use of "pods" of agents who exclusively (or preferentially) sold the Medicare Advantage and Medicare Supplement insurance plans of insurers who paid kickbacks to SelectQuote;

(c)    SelectQuote set up subsidiaries (including Tiburon) which did not offer unbiased advice aligned to the specific needs of each customer but instead consisted of exclusive (or semi-exclusive) agents posing as unbiased agents;

(d)    SelectQuote used "suppression tools" to remove competing insurers from its internal quoting tool for agents in order to favor insurers who had paid kickbacks, without regard for the best interests of beneficiaries;

(e)    SelectQuote's use of these steering techniques in return for kickbacks violated state and federal laws and regulations, exposing SelectQuote and its officers to potential civil and criminal liability and severe reputational damage; and

(f)    Irrespective of whether SelectQuote's steering practices independently violated state or federal laws or regulations, these practices were inconsistent with SelectQuote's promise of providing "unbiased comparisons."

129.    On November 6, 2020, SelectQuote filed with the SEC its Form 10-Q for the period ending September 30, 2020 (the "1Q21 10-Q").  The 1Q21 10-Q stated, in relevant part:

> SelectQuote Senior ("Senior"), our fastest growing and largest segment, was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***

130.    These statements were repeated verbatim in SelectQuote's Form 10-Q for the period ending December 31, 2020 filed with the SEC on February 8, 2021 (the "2Q21 10-Q"); its Form 10-Q for the period ending March 31, 2021 filed with the SEC on May 12, 2021 (the "3Q21 10-Q"); and its Form 10-K for the fiscal year ending June 30, 2021 filed with the SEC on August

26, 2021 (the "FY21 10-K"). The 1Q21 10-Q, 2Q21 10-Q, 3Q21 10-Q, and FY21 10-K were signed by Defendants Danker and Sadun.

131. The statements made in the 1Q21 10-Q, 2Q21 10-Q, 3Q21 10-Q and FY21 10-K identified in ¶129 and ¶130 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶128 with respect to the statements in ¶125, ¶126, and ¶127, that is, the failure to disclose the material facts identified in ¶128(a)-(f) rendered the statements materially misleading.

132. In addition, SelectQuote's FY21 10-K stated, in relevant part:

We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. ***Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.***

133. The statements made in SelectQuote's FY21 10-K identified in ¶132 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶128 with respect to the statements in ¶125, ¶126, and ¶127, that is, the failure to disclose the material facts identified in ¶128(a)-(f) rendered the statements materially misleading.

134. On November 5, 2020, the Company hosted an earnings call to discuss its first quarter 2021 financial results (the "1Q21 EC"). Defendants Danker, Sadan, and Grant participated in the 1Q21 EC. During the 1Q21 EC, Defendant Danker touted that the Company's Senior division Medicare Advantage sales success "underscores the value" of its alleged "***true consumer choice model***." Specifically, Defendant Danker stated, in relevant part:

I'll start with the Senior market as a whole. Overall, growth for Medicare Advantage market is expected to be in the 10% range as forecasted by CMS, with total Medicare Advantage enrollment increasing to approximately 27 million Americans. On top of that plan, choices will increase about 20% this year. We

believe this increasing complexity underscores the value of our **_true consumer choice model._**

135.    The statements made in SelectQuote's 1Q21 EC identified in ¶134 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶128 with respect to the statements in ¶125, ¶126, and ¶127, that is, the failure to disclose the material facts identified in ¶128(a)-(f) rendered the statements  materially misleading.  In addition, the statements in ¶134 were materially false and/or misleading because the touting of SelectQuote's "true consumer choice model" presented a misleading impression of SelectQuote's business practices, while failing to disclose the improper and illegal steering practices that Defendants used to route customers to insurance companies paying kickbacks.  This misleading effect of these statements was strengthened by Defendants' previous representations of "unbiased comparison shopping" and "unbiased comparisons." *See* ¶¶125-133, *supra*.

136.    Further, during the 1Q21 EC, Defendant Sadan, after being asked by an analyst if the Company is agnostic on insurance carrier sales, assured investors that any shift in the mix of providers it connects was "**_not driven by our agents steering business one way or the other_**" as the Company is **_"an open platform._**"  Sudan further assured investors, if a carrier was receiving a larger mix of total plans sold, "**_it's really a function of those carriers having plans which are competitive in the marketplace_**."  Defendant Sedan later reiterated the Company is an "**_agnostic platform._**"  Specifically, Defendant Sadan stated, in relevant part:

> [Analyst]: . . .And then you just mentioned the differences and persistency between carriers. So wondering, **_are you agnostic on the carrier when selling given that?_**

> \*                    \*                    \*

> [Sadun:] . . . In terms of different carriers having different persistency, in general, they are in a range, but yes, different carriers do have a slightly different persistency. And we have seen a mix shift towards carriers that have higher persistency. Now,

*that's not driven by our agents steering business one way or the other. We're an open platform.* And so it's really a function of those carriers having plans which are competitive in the marketplace, and those plans basically taking a larger piece of share.

            *            *            *

So we feel really strong about that, especially in regards to kind of our book and the conversations that we get to have with our book, which would be - on the first one as far as the switchers. And then to your second question, *as far as when we bring a carrier on, it really depends on the size, scale and competitiveness of that carrier. Since we are an agnostic platform*, it will really depend on the size of that.

137.    The statements made in SelectQuote's 1Q21 EC identified in ¶136 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶128 with respect to the statements in ¶125, ¶126, and ¶127, that is, the failure to disclose the material facts identified in ¶128(a)-(f) rendered the statements materially misleading. In addition, the statements in ¶136 were materially false and/or misleading because SelectQuote's statement that its provider mix was "not driven by our agents steering business one way or the other" and was only "a function of those carriers having plans which are competitive in the marketplace" was false and misleading given the Company's improper and illegal steering practices that Defendants used to route customers to insurance companies paying kickbacks. Further, the statement that the Company was an "agnostic platform" was false and misleading given that the platform was not agnostic because kickbacks were weighed when steering customers to insurer's plans. This misleading effect of these statements was strengthened by Defendants' previous representations of "unbiased comparison shopping" and "unbiased comparisons." *See* ¶¶125-133, *supra*.

138.    On February 8, 2021, the Company hosted an earnings call pursuant to its second quarter 2021 financial results (the "2Q21 EC"). Defendants Danker, Sadun, and Grant participated in the 2Q21 EC. During the 2Q21 EC, Defendant Danker touted the manner in which the

Company's agents allegedly "***conduct a thorough personalized needs-based assessment for each customer to make sure they find the right policy for them.***"  Danker further touted the manner in which the Company's call routing technology assisted in the performance of this function, including to "***best match leads to the right agents based on close rates and service quality***." Specifically, during the 2Q21 EC, Defendant Danker stated as follows, in relevant part:

> Our agents don't just process information efficiently, but they conduct a thorough ***personalized needs-based assessment for each customer to make sure they find the right policy for them***.
>
>             \*                     \*                     \*
>
> There certainly isn't time on this call to speak to each component of our technology, so let me provide one example across our marketing and lead workflow on slide 7. At the highest level, we have built custom technology at every step of the process from the lead buying decision to how those leads are scored enriched and routed. We begin with our wide funnel approach to aggregate leads from a variety of sources that can be toggled up and down based upon what the market environment presents us.
>
> From there we've developed proprietary technology called SelectBid by leveraging investments in data science SelectBid allows us to make intelligent real-time lead buying and pricing decisions by combining the ***lead data with our historical performance data, third-party data and custom algorithms to predict the expected LTV of a customer and prices to bid accordingly***. From there we apply similar data science to ***best match leads to the right agents based on close rates and service quality***.
>
> When the agent enters the process we apply just as much technology at the customer service level. We've developed robust tools to ***match customers and plans against the best combination of doctor's, prescription drugs and their future medical needs***.

139.    The statements made in SelectQuote's 1Q21 EC identified in ¶138 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶128 with respect to the statements in ¶125, ¶126, and ¶127, that is, the failure to disclose the material facts identified in ¶128(a)-(f) rendered the statements  materially misleading.  In addition, the statements in ¶138

were materially false and/or misleading because the touting of SelectQuote's agents "personalized needs-based assessment for each customer to make sure they find the right policy for them" and that its routing technology was used to "best match leads to the right agents based on close rates and service quality" was materially false and/or misleading because SelectQuote's steering of customers to insurance companies paying kickbacks did not put the needs of the customers first; it instead narrowed customer options and pushed them toward plans by the companies who paid SelectQuote the most money. The misleading effect of these statements was strengthened by Defendants' previous representations of "unbiased comparison shopping" and "unbiased comparisons." *See* ¶¶125-133, *supra*.

### 3.    Statements Concerning FY 2022 And Interim Periods Within FY 2022

140.    On November 4, 2021, SelectQuote reported its financial results for the first quarter of fiscal year 2022 ending on September 30, 2021 (the "1Q22 PR"). The 1Q22 PR stated, in relevant part:

> The company pioneered the direct-to-consumer ***model of providing unbiased comparisons*** from multiple, highly-rated insurance companies ***allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success:*** a strong force of highly-trained and skilled ***agents who provide a consultative needs analysis for every consumer,*** and ***proprietary technology that sources, scores, and routes high-quality sales leads.***

141.    These statements were repeated verbatim in SelectQuote's press release reporting financial results for the second quarter ending on December 31, 2021 (the "2Q22 PR").[116]

---

[116] The 1Q22 PR was filed with the SEC on November 4, 2021 as Exhibit 99.1 to a Form 8-K signed by Defendant Sadun. The 2Q22 PR was filed with the SEC on February 7, 2022 as Exhibit 99.1 to a Form 8-K signed by Defendant Sadun.

142. The statements made in the 1Q22 PR and 2Q22 PR identified in ¶140 and ¶141 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a) Between 2016 and ***at least*** 2021, SelectQuote steered beneficiaries into Medicare Advantage and Medicate Supplement insurance plans offered by insurers who paid kickbacks to SelectQuote, without the beneficiaries' knowledge and regardless of the quality or suitability of the insurers' plans to the beneficiaries' individual needs;

(b) SelectQuote's steering techniques included the use of "pods" of agents who exclusively (or preferentially) sold the Medicare Advantage and Medicare Supplement insurance plans of insurers who paid kickbacks to SelectQuote;

(c) SelectQuote set up subsidiaries (including Tiburon) which did not offer unbiased advice aligned to the specific needs of each customer but instead consisted of exclusive (or semi-exclusive) agents posing as unbiased agents;

(d) SelectQuote used "suppression tools" to remove competing insurers from its internal quoting tool for agents in order to favor insurers who had paid kickbacks, without regard for the best interests of beneficiaries;

(e) SelectQuote's use of these steering techniques in return for kickbacks violated state and federal laws and regulations, exposing SelectQuote and its officers to potential civil and criminal liability and severe reputational damage;

(f) Irrespective of whether SelectQuote's steering practices independently violated state or federal laws or regulations, these practices were inconsistent with SelectQuote's promise of providing "unbiased comparisons"; and

(g)     Even if SelectQuote's steering practices stopped at some point, its statements touting an "unbiased" comparison model were materially misleading without disclosing the historical steering practices between 2016 and 2021. Defendants still faced ongoing exposure to civil and criminal liability and severe reputational harm if the past steering practices were uncovered. And Defendants' claim that they "pioneered" an "unbiased" model falsely suggested that they had been providing unbiased advice from inception of the model continuously to the present.

143.    On May 5, 2022, SelectQuote issued a press release reporting its financial results for the third quarter of fiscal year 2022 ending on March 31, 2022 (the "3Q22 PR"). The 3Q22 PR stated, in relevant part:

> SelectQuote pioneered the **model of providing unbiased comparisons** from multiple, highly-rated insurance companies **allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin the company's success:** a strong force of highly-trained and skilled **agents who provide a consultative needs analysis for every consumer**, and **proprietary technology that sources and routes high-quality leads.**

144.    These statements were repeated verbatim in SelectQuote's press release announcing financial results for the fourth quarter and year ending on June 30, 2022 (the "FY22 PR"), issued on August 29, 2022.[117]

145.    The statements made in SelectQuote's 3Q22 PR and FY22 PR identified in ¶143 and ¶144 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶142 with

---

[117]    The 3Q22 PR was filed with the SEC on May 5, 2022 as Exhibit 99.1 to a Form 8-K signed by Defendant Sadun. The FY22 PR was filed with the SEC on August 29, 2022 as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.

respect to the statements in ¶140 and ¶141, that is, the failure to disclose the material facts identified in ¶142(a)-(g) rendered the statements materially misleading.

146.    On November 5, 2021, SelectQuote filed with the SEC its Form 10-Q for the period ending September 30, 2021 (the "1Q22 10-Q"). The 1Q22 10-Q stated, in relevant part:

> SelectQuote Senior ("Senior"), our fastest growing and largest segment, was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***

147.    These statements were repeated verbatim in SelectQuote's Form 10-K for the fiscal year ending June 30, 2022 filed with the SEC on August 29, 2022 (the "FY22 10-K").

148.    On February 14, 2022, SelectQuote filed with the SEC its Form 10-Q for the period ending December 31, 2021 (the "2Q22 10-Q"). The 2Q22 10-Q stated, in relevant part:

> Senior, our fastest growing and largest segment, was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***

149.    These statements were repeated verbatim in SelectQuote's Form 10-Q for the period ending March 31, 2022 filed with the SEC on May 5, 2022 (the "3Q22 10-Q"). The 1Q22 10-Q; 2Q22 10-Q and 3Q22 10-Q were signed by Defendants Danker and Sadun. The FY22 10-K was signed by Defendants Danker and Clement.

150.    The statements made in SelectQuote's 1Q22 10-Q, 2Q22 10-Q, 3Q222 10-Q, and FY22 10-K identified in ¶146, ¶147, ¶148, and ¶149 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶142 with respect to the statements in ¶140 and ¶141, that is, the failure to disclose the material facts identified in ¶142(a)-(g) rendered the statements materially misleading.

151.    In addition, SelectQuote's FY22 10-K stated, in relevant part:

We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. ***Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.***

152.    The statements made in SelectQuote's FY22 10-K identified in ¶151 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶142 with respect to the statements in ¶140 and ¶141, that is, the failure to disclose the material facts identified in ¶142(a)-(g) rendered the statements  materially misleading.

### 4.    Statements Concerning FY 2023 And Interim Periods Within FY 2023

153.    On November 3, 2022, the Company reported its financial results for the first quarter ending on September 30, 2022 (the "1Q23 PR").  The 1Q23 PR was filed with the SEC on the same date as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.  The 1Q23 PR stated SelectQuote's business model is based on "providing unbiased comparisons" to allow "consumers to choose the policy and terms that best meet their unique needs."  Specifically, the 1Q23 PR stated as follows in relevant part:

The company pioneered the ***model of providing unbiased comparisons*** from multiple, highly-rated insurance companies ***allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success:*** a strong force of highly-trained and skilled ***agents who provide a consultative needs analysis for every consumer,*** and ***proprietary technology that sources and routes high-quality leads.***

154.    These statements were repeated verbatim in SelectQuote's press release reporting financial results for the second quarter ending on December 31, 2021 (the "2Q23 PR"); financial

results for the third quarter ending on March 31, 2023 (the "3Q23 PR"); and financial results for the fourth quarter and year ending on June 30, 2023 (the "FY23 PR").[118]

155.    The statements made in the 1Q23 PR, 2Q23 PR, 3Q23 PR and FY23 PR identified in ¶153 and ¶154 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a)    Between 2016 and *at least* 2021, SelectQuote steered beneficiaries into Medicare Advantage and Medicate Supplement insurance plans offered by insurers who paid kickbacks to SelectQuote, without the beneficiaries' knowledge and regardless of the quality or suitability of the insurers' plans to the beneficiaries' individual needs;

(b)    SelectQuote's steering techniques included the use of "pods" of agents who exclusively (or preferentially) sold the Medicare Advantage and Medicare Supplement insurance plans of insurers who paid kickbacks to SelectQuote;

(c)    SelectQuote set up subsidiaries (including Tiburon) which did not offer unbiased advice aligned to the specific needs of each customer but instead consisted of exclusive (or semi-exclusive) agents posing as unbiased agents;

(d)    SelectQuote used "suppression tools" to remove competing insurers from its internal quoting tool for agents in order to favor insurers who had paid kickbacks, without regard for the best interests of beneficiaries;

---

[118]    The 1Q23 PR was filed with the SEC on November 3, 2022 as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.  The 2Q23 PR was filed with the SEC on February 7, 2023 as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.  The 3Q23 PR was filed with the SEC on May 10, 2023 as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.  The FY23 PR was filed with the SEC on September 13, 2023 as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.

(e)    SelectQuote's use of these steering techniques in return for kickbacks violated state and federal laws and regulations, exposing SelectQuote and its officers to potential civil and criminal liability and severe reputational damage;

(f)    Irrespective of whether SelectQuote's steering practices independently violated state or federal laws or regulations, these practices were inconsistent with SelectQuote's promise of providing "unbiased comparisons"; and

(g)    Even if SelectQuote's steering practices stopped at some point, its statements touting an "unbiased" comparison model were materially misleading without disclosing the historical steering practices between 2016 and 2021. Defendants still faced ongoing exposure to civil and criminal liability and severe reputational harm if the past steering practices were uncovered. And Defendants' claim that they "pioneered" an "unbiased" model falsely suggested that they had been providing unbiased advice from inception of the model continuously to the present.

156.    On November 3, 2022, SelectQuote filed its Form 10-Q for the period ending September 30, 2022 (the "1Q23 10-Q"). The 1Q23 10-Q was signed by Defendants Danker and Clement. The 1Q23 10-Q stated the Company provides "***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans.***" Specifically, the 1Q22 10-Q stated as follows in relevant part:

> Senior was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***

157.    These statements were repeated verbatim in SelectQuote's Form 10-Q for the period ending on December 31, 2022 filed February 7, 2023 (the "2Q23 10-Q"); its Form 10-Q for the period ending Form 10-Q for the period ending March 31, 2023 filed May 10, 2023 (the "3Q23 10-Q"); and its Form 10-K for the fiscal year ending June 30, 2023 filed September 13, 2023 (the

"FY23 10-K"). The 1Q23 10-Q; 2Q23 10-Q; 3Q23 10-Q; and FY23 10-K were signed by Defendants Danker and Clement.

158. The statements made in SelectQuote's 1Q23 10-Q, 2Q23 10-Q, 3Q23 10-Q, and FY23 10-K identified in ¶156 and ¶157 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶155 with respect to the statements in ¶153 and ¶154, that is, the failure to disclose the material facts identified in ¶155(a)-(g) rendered the statements materially misleading.

159. In addition, SelectQuote's FY23 10-K stated, in relevant part:

> We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. ***Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.***

160. The statements made in SelectQuote's FY23 10-K identified in ¶159 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶155 with respect to the statements in ¶153 and ¶154, that is, the failure to disclose the material facts identified in ¶155(a)-(g) rendered the statements  materially misleading.

### 5.     Statements Concerning FY 2024 And Interim Periods Within FY 2024

161. On November 2, 2023, the Company reported its financial results for the first quarter ending on September 30, 2023 (the "1Q24 PR"). The 1Q24 PR was filed with the SEC on the same date as Exhibit 99.1 to a Form 8-K signed by Defendant Clement. The 1Q24 PR stated the Company's business model is based on "***providing unbiased comparisons***" to allow "***consumers to choose the policy and terms that best meet their unique needs***." Specifically, the 1Q24 PR stated as follows in relevant part:

The company pioneered the model of providing **unbiased comparisons** from multiple, highly-rated insurance companies **allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success:** a strong force of highly-trained and skilled **agents who provide a consultative needs analysis for every consumer**, and **proprietary technology that sources and routes high-quality leads**.

162.    These statements were repeated verbatim in SelectQuote's press release reporting financial results for the second quarter ending on December 31, 2023 (the "2Q24 PR"); financial results for the third quarter ending on March 31, 2024 (the "3Q24 PR"); and financial results for the fourth quarter and year ending on June 30, 2024 (the "FY24 PR").[119]

163.    The statements made in the 1Q24 PR, 2Q24 PR, 3Q24 PR and FY24 PR identified in ¶161 and ¶162 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a)    Between 2016 and **at least** 2021, SelectQuote steered beneficiaries into Medicare Advantage and Medicate Supplement insurance plans offered by insurers who paid kickbacks to SelectQuote, without the beneficiaries' knowledge and regardless of the quality or suitability of the insurers' plans to the beneficiaries' individual needs;

(b)    SelectQuote's steering techniques included the use of "pods" of agents who exclusively (or preferentially) sold the Medicare Advantage and Medicare Supplement insurance plans of insurers who paid kickbacks to SelectQuote;

(c)    SelectQuote set up subsidiaries (including Tiburon) which did not offer unbiased advice aligned to the specific needs of each customer but instead consisted of

---

[119]    The 1Q24 PR was filed with the SEC on November 2, 2023 as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.  The 2Q24 PR was filed with the SEC on February 7, 2024 as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.  The 3Q24 PR was filed with the SEC on May 9, 2024 as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.  The FY24 PR was filed with the SEC on September 13, 2024 as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.

exclusive (or semi-exclusive) agents posing as unbiased agents;

(d)     SelectQuote used "suppression tools" to remove competing insurers from its internal quoting tool for agents in order to favor insurers who had paid kickbacks, without regard for the best interests of beneficiaries;

(e)     SelectQuote's use of these steering techniques in return for kickbacks violated state and federal laws and regulations, exposing SelectQuote and its officers to potential civil and criminal liability and severe reputational damage;

(f)     Irrespective of whether SelectQuote's steering practices independently violated state or federal laws or regulations, these practices were inconsistent with SelectQuote's promise of providing "unbiased comparisons"; and

(g)     Even if SelectQuote's steering practices stopped at some point, its statements touting an "unbiased" comparison model were materially misleading without disclosing the historical steering practices between 2016 and 2021.  Defendants still faced ongoing exposure to civil and criminal liability and severe reputational harm if the past steering practices were uncovered.  And Defendants' claim that they "pioneered" an "unbiased" model falsely suggested that they had been providing unbiased advice from inception of the model continuously to the present.

164.    On November 3, 2023, SelectQuote filed its Form 10-Q for the period ending September 30, 2023 (the "1Q24 10-Q").  The 1Q24 10-Q was signed by Defendants Danker and Clement. The 1Q24 10-Q stated the Company provides "***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans.***" Specifically, the 1Q22 10-Q stated as follows in relevant part:

> Senior was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***

165.    These statements were repeated verbatim in SelectQuote's Form 10-Q for the period ending on December 31, 2022 filed February 8, 2024 (the "2Q24 10-Q"); its Form 10-Q for the period ending Form 10-Q for the period ending March 31, 2023 filed May 9, 2024 (the "3Q24 10-Q"); and its Form 10-K for the fiscal year ending June 30, 2024 filed September 13, 2024 (the "FY24 10-K"). The 1Q24 10-Q; 2Q24 10-Q; 3Q24 10-Q; and FY24 10-K were signed by Defendants Danker and Clement.

166.    The statements made in SelectQuote's 1Q24 10-Q, 2Q24 10-Q, 3Q24 10-Q, and FY24 10-K identified in ¶164 and ¶165 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶163 with respect to the statements in ¶161 and ¶162, that is, the failure to disclose the material facts identified in ¶163(a)-(g) rendered the statements materially misleading.

### 6.    Statements Concerning FY 2025 And Interim Periods Within FY 2025

167.    On November 4, 2024, the Company reported its financial results for the first quarter ending on September 30, 2024 (the "1Q25 PR"). The 1Q25 PR was filed with the SEC on the same date as Exhibit 99.1 to a Form 8-K signed by Defendant Clement. The 1Q25 PR stated the Company's business model is based on "***providing unbiased comparisons***" to allow "***consumers to choose the policy and terms that best meet their unique needs***." Specifically, the 1Q25 PR stated as follows in relevant part:

> The company pioneered the model of providing ***unbiased comparisons*** from multiple, highly-rated insurance companies ***allowing consumers to choose the policy and terms that best meet their unique needs.*** Two foundational pillars underpin SelectQuote's success: a strong force of highly-trained and skilled ***agents who provide a consultative needs analysis*** for every consumer, and ***proprietary technology that sources and routes high-quality leads***.

168.    The statements made in the 1Q25 PR identified in ¶167 were materially false and/or

misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a)   Between 2016 and *at least* 2021, SelectQuote steered beneficiaries into Medicare Advantage and Medicate Supplement insurance plans offered by insurers who paid kickbacks to SelectQuote, without the beneficiaries' knowledge and regardless of the quality or suitability of the insurers' plans to the beneficiaries' individual needs;

(b)   SelectQuote's steering techniques included the use of "pods" of agents who exclusively (or preferentially) sold the Medicare Advantage and Medicare Supplement insurance plans of insurers who paid kickbacks to SelectQuote;

(c)   SelectQuote set up subsidiaries (including Tiburon) which did not offer unbiased advice aligned to the specific needs of each customer but instead consisted of exclusive (or semi-exclusive) agents posing as unbiased agents;

(d)   SelectQuote used "suppression tools" to remove competing insurers from its internal quoting tool for agents in order to favor insurers who had paid kickbacks, without regard for the best interests of beneficiaries;

(e)   SelectQuote's use of these steering techniques in return for kickbacks violated state and federal laws and regulations, exposing SelectQuote and its officers to potential civil and criminal liability and severe reputational damage;

(f)   Irrespective of whether SelectQuote's steering practices independently violated state or federal laws or regulations, these practices were inconsistent with SelectQuote's promise of providing "unbiased comparisons"; and

(g)   Even if SelectQuote's steering practices stopped at some point, its statements touting an "unbiased" comparison model were materially misleading without

disclosing the historical steering practices between 2016 and 2021.  Defendants still faced ongoing exposure to civil and criminal liability and severe reputational harm if the past steering practices were uncovered.  And Defendants' claim that they "pioneered" an "unbiased" model falsely suggested that they had been providing unbiased advice from inception of the model continuously to the present.

169.    On February 10, 2025, the Company reported its financial results for the second quarter ending on December 31, 2024 (the "2Q25 PR").  The 2Q25 PR was filed with the SEC on the same date as Exhibit 99.1 to a Form 8-K signed by Defendant Clement.  The 2Q25 PR stated as follows in relevant part:

> Founded in 1985, SelectQuote (NYSE: SLQT) pioneered the model of ***providing unbiased comparisons*** from multiple, highly-rated insurance companies, ***allowing consumers to choose the policy and terms that best meet their unique needs.*** Two foundational pillars underpin SelectQuote's success: a strong force of highly-trained and skilled ***agents who provide a consultative needs analysis*** for every consumer, and ***proprietary technology that sources and routes high-quality leads***.

170.    The statements made in SelectQuote's 2Q25 PR identified in ¶169 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶168 with respect to the statements in ¶167, that is, the failure to disclose the material facts identified in ¶168(a)-(g) rendered the statements  materially misleading.

171.    On November 4, 2024, SelectQuote filed its Form 10-Q for the period ending September 30, 2024 (the "1Q25 10-Q").  The 1Q25 10-Q stated the Company provides "***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans.***"  Specifically, the 2Q25 10-Q stated as follows in relevant part:

> Senior was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***

172.    These statements were repeated verbatim in SelectQuote's Form 10-Q for the period ending on December 31, 2024 filed February 10, 2025 (the "2Q25 10-Q").  The 1Q25 10-Q and 2Q25 10-Q were signed by Defendants Danker and Clement.

173.    The statements made in SelectQuote's 1Q25 10-Q and 2Q25 10-Q identified in ¶171 and ¶172 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶168 with respect to the statements in ¶167, that is, the failure to disclose the material facts identified in ¶168(a)-(g) rendered the statements  materially misleading.

### B.    Additional Statements About Quality Of SelectQuote's Customer Service And Customer-First Approach

174.    On May 3, 2021, SelectQuote hosted a conference call in conjunction with the launch of the Company's new Population Health platform. During the conference call, Danker touted the manner in which SelectQuote's sales force scanned the market for consumers so that they could make the most well-informed choices about their healthcare decisions.  Specifically, Defendant Danker stated in relevant part:

> [L]et's begin on Slide 3 with a brief overview of our core insurance distribution business and why our holistic approach to customer intelligence and service is also at the heart of our Population Health initiative. ***SelectQuote is a leading technology-enabled, direct-to-consumer insurance distribution platform. We pioneered the first direct-to-consumer sale of term life back in 1985 through a model that combined direct marketing, technology and a professional inside sales force that compares and shop[s] the market to find the best fit for each consumer.***
>
> Our convenient, customer-centric approach is best articulated by our tagline, we shop, you save. Over the last decade, SelectQuote Senior has grown into our largest division, with year-over-year revenue growth exceeding 100% for the last 4 consecutive quarter

175.    Danker's statements during the May 3, 2021 presentation identified in ¶174 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a)     Between 2016 and 2021, SelectQuote steered beneficiaries into Medicare Advantage and Medicate Supplement insurance plans offered by insurers who paid kickbacks to SelectQuote, without the beneficiaries' knowledge and regardless of the quality or suitability of the insurers' plans to the beneficiaries' individual needs;

(b)     SelectQuote's steering techniques included the use of "pods" of agents who exclusively (or preferentially) sold the Medicare Advantage and Medicare Supplement insurance plans of insurers who paid kickbacks to SelectQuote;

(c)     SelectQuote set up subsidiaries (including Tiburon) which did not offer unbiased advice aligned to the specific needs of each customer but instead consisted of exclusive (or semi-exclusive) agents posing as unbiased agents;

(d)     SelectQuote used "suppression tools" to remove competing insurers from its internal quoting tool for agents in order to favor insurers who had paid kickbacks, without regard for the best interests of beneficiaries, and the description of SelectQuote's technology as the "best in the industry," without disclosing the use of the "suppression tools" misled investors as to Defendants' prior representations of providing "unbiased comparison shopping" and "unbiased comparisons." *See* ¶¶117, 119, *supra*;

(e)     SelectQuote's use of these steering techniques in return for kickbacks violated state and federal laws and regulations, exposing SelectQuote and its officers to potential civil and criminal liability and severe reputational damage; and

(f)     The touting of SelectQuote's "professional inside sales force" and its ability to survey the market for the "best fit for each customer" presented a misleading impression of SelectQuote's business practices, while failing to disclose the

improper and illegal steering practices that Defendants used to route customers to insurance companies paying kickbacks.  The misleading effect of these statements was strengthened by Defendants' previous representations of "unbiased comparison shopping" and "unbiased comparisons." *See* ¶¶117, 119, *supra*.

176.    During the same May 3, 2021 conference call, Grant touted SelectQuote's "customer first" approach.  He stated, in relevant part:

> . . . SelectQuote Senior has grown into the market leader in Medicare plan distribution by ***always putting the customer first***. We feel our industry-leading retention and LTVs are a testament to the great advice our 100% internal agent force delivers every day. ***This customer-first attitude has helped us achieve these results, and that attitude has also driven our decision to enter into the health care space***.

177.    Grant's statements during the May 3, 2021 presentation identified in ¶176 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth above in ¶175 with respect to the statements in ¶174, that is, the failure to disclose the material facts identified in ¶175(a)-(f) rendered the statements  materially misleading.  In addition, the statements in ¶176 were materially false and/or misleading because SelectQuote's steering of customers to insurance companies paying kickbacks did not put the needs of the customers first; it instead narrowed customer options and pushed them toward plans by the companies who paid SelectQuote the most money.

## C.    The Company's Statements About Risks Related To Compliance With Laws And Regulations

178.    The FY20 10-K purported to warn of the risks to the Company, including those related to compliance with law and regulation, which "***may***" or "***could***" impact the Company, as follows in relevant part:

> ***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the***

*marketing and sale of Medicare plans could harm our business, operating results, financial condition and prospects.*

Our Senior segment is subject to a complex legal and regulatory framework and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS for Medicare Advantage and Medicare Part D prescription drug plans, change frequently. ***Changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.***

***Changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods.***

179. The statements in ¶178 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a) The contingent statement that "***non-compliance*** with or changes in laws and regulations governing the marketing and sale of Medicare plans" "***could***" "harm our business, operating results, financial condition and prospects" implied that SelectQuote was not at the time non-compliant with the laws and regulations governing the marketing and sale of Medicare plans, when in fact the Company was already non-compliant;

(b) Similarly, the contingent statement that "***Changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could*** harm our business, operating results, financial condition and prospects" implied that Defendants were not aware of already existing (or previously existing) conduct that violated then-current laws and regulations; and

(c)     The statements were materially misleading because they failed to disclose both (i) significant materializations of the risks that had already occurred and (ii) concrete facts that materially increased the magnitude and impact of these risks. Specifically, the statements failed to disclose that:

(1)     Between 2016 and 2020, SelectQuote received illegal renumerations (a/k/a kickbacks) from insurers in return for commitments to meet specific targets for enrollment of beneficiaries in Medicare Advantage plans in a manner which violated Federal law;

(2)     SelectQuote was therefore already non-complaint with laws and regulations governing the marketing and sale of Medicare plans, including the Anti-Kickback statute and the False Claims Act; and

(3)     As a result of the foregoing, the risk had already materialized in substantial part, as Defendants' conduct had exposed SelectQuote and its officers to civil and criminal liability and severe reputational damage, and therefore the risk to the Company's business, operating results, financial condition and prospects was materially higher than Defendants' statements suggested.

180.    The FY21 10-K purported to warn of the risks to the Company, including those related to compliance with law and regulation, which "***may***" or "***could***" impact the Company, as follows in relevant part:

> ***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans could harm our business, operating results, financial condition and prospects.***
>
> Our Senior segment is subject to a complex legal and regulatory framework and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS for Medicare Advantage and Medicare Part D prescription drug plans, change frequently.

***Changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.***

***Changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods***.

181. The statements in ¶180 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a)    The contingent statement that "***non-compliance*** with or changes in laws and regulations governing the marketing and sale of Medicare plans" "***could***" "harm our business, operating results, financial condition and prospects" implied that SelectQuote Company was not at the time non-compliant with the laws and regulations governing the marketing and sale of Medicare plans, when in fact the Company was already non-compliant;

(b)    Similarly, the contingent statement that "***Changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could*** harm our business, operating results, financial condition and prospects" implied that Defendants were not aware of already existing (or previously existing) conduct that violated then-current laws and regulations; and

(c)    The statements were materially misleading because they failed to disclose both (i) significant materializations of the risks that had already occurred and (ii) concrete facts that materially increased the magnitude and impact of these risks. Specifically, the statements failed to disclose that:

(1)      Between 2016 and 2021, SelectQuote received illegal renumerations (a/k/a kickbacks) from insurers in return for commitments to meet specific targets for enrollment of beneficiaries in Medicare Advantage plans in a manner which violated Federal law;

(2)      SelectQuote was therefore already non-complaint with laws and regulations governing the marketing and sale of Medicare plans, including the Anti-Kickback statute and the False Claims Act; and

(3)      As a result of the foregoing, the risk had already materialized in substantial part, as Defendants' conduct had exposed SelectQuote and its officers to civil and criminal liability and severe reputational damage, and therefore the risk to the Company's business, operating results, financial condition and prospects was materially higher than Defendants' statements suggested.

182.    The FY22 10-K purported to warn of the risks to the Company, including those related to compliance with law and regulation, which "*may*" or "*could*" impact the Company, as follows in relevant part:

> ***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans and other healthcare-related products and services could harm our business, operating results, financial condition and prospects.***
>
> Our Senior segment is subject to a complex legal and regulatory framework, and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS related to Medicare Advantage and Medicare Part D prescription drug plans, change frequently. ***Changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.***
>
> ***Changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve***

*aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods.*

183.    The statements in ¶182 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a)    The contingent statement that "***non-compliance*** with or changes in laws and regulations governing the marketing and sale of Medicare plans" "***could***" "harm our business, operating results, financial condition and prospects" implied that SelectQuote was not at the time non-compliant with the laws and regulations governing the marketing and sale of Medicare plans, when in fact the Company was already non-compliant;

(b)    Similarly, the contingent statement that "***Changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could*** harm our business, operating results, financial condition and prospects" implied that Defendants were not aware of already existing (or previously existing) conduct that violated then-current laws and regulations; and

(c)    The statements were materially misleading because they failed to disclose both (i) significant materializations of the risks that had already occurred and (ii) concrete facts that materially increased the magnitude and impact of these risks. Specifically, the statements failed to disclose that:

(1)    Between 2016 and at least 2021, SelectQuote received illegal renumerations (a/k/a kickbacks) from insurers in return for commitments to

meet specific targets for enrollment of beneficiaries in Medicare Advantage plans in a manner which violated Federal law;

(2)     SelectQuote was therefore already non-complaint with laws and regulations governing the marketing and sale of Medicare plans, including the Anti-Kickback statute and False Claims Act; and

(3)     As a result of the foregoing, the risk had already materialized in substantial part, as Defendants' conduct had exposed SelectQuote and its officers to civil and criminal liability and severe reputational damage, and therefore the risk to the Company's business, operating results, financial condition and prospects was materially higher than Defendants' statements suggested.

184.    The FY23 10-K purported to warn of the risks to the Company, including those related to compliance with law and regulation, which "*may*" or "*could*" impact the Company, as follows in relevant part:

> ***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans and other healthcare-related products and services could harm our business, operating results, financial condition and prospects.***
>
> Our Senior segment is subject to a complex legal and regulatory framework, and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS related to Medicare Advantage and Medicare Part D prescription drug plans, change frequently. For example, in April 2023, CMS finalized rules that could increase compliance costs and otherwise impact our business results by, among other things, requiring new disclosures that could make certain forms of marketing less practicable and potentially requiring a 48-hour waiting period between initial contact with a beneficiary and enrolling that beneficiary. ***These and any other changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.***
>
> ***In addition, changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause***

*insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods*.

185.    The statements in ¶184 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a)    The contingent statement that "***non-compliance*** with or changes in laws and regulations governing the marketing and sale of Medicare plans" "***could***" "harm our business, operating results, financial condition and prospects" implied that SelectQuote was not at the time non-compliant with the laws and regulations governing the marketing and sale of Medicare plans, when in fact the Company was already non-compliant;

(b)    Similarly, the contingent statement that "***changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could*** harm our business, operating results, financial condition and prospects" implied that Defendants were not aware of already existing (or previously existing) conduct that violated then-current laws and regulations; and

(c)    The statements were materially misleading because they failed to disclose both (i) significant materializations of the risks that had already occurred and (ii) concrete facts that materially increased the magnitude and impact of these risks. Specifically, the statements failed to disclose that:

(1)    Between 2016 and at least 2021, SelectQuote received illegal renumerations (a/k/a kickbacks) from insurers in return for commitments to

69

meet specific targets for enrollment of beneficiaries in Medicare Advantage plans in a manner which violated Federal law;

(2)    SelectQuote was therefore already non-complaint with laws and regulations governing the marketing and sale of Medicare plans. including the Anti-Kickback statute and False Claims Act; and

(3)    As a result of the foregoing, the risk had already materialized in substantial part, as Defendants' conduct had exposed SelectQuote and its officers to civil and criminal liability and severe reputational damage, and therefore the risk to the Company's business, operating results, financial condition and prospects was materially higher than Defendants' statements suggested.

186.    The FY24 10-K purported to warn of the risks to the Company, including those related to compliance with law and regulation, which "*may*" or "*could*" impact the Company, as follows in relevant part:

> ***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans and other health-related products and services could harm our business, operating results, financial condition and prospects.***
>
> Our Senior segment is subject to a complex legal and regulatory framework, and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS related to Medicare Advantage and Medicare Part D Prescription Drug plans, change frequently. For example, in April 2023, CMS finalized rules that could increase compliance costs and otherwise impact our business results by, among other things, requiring new disclosures that could make certain forms of marketing less practicable and potentially requiring a 48-hour waiting period between initial contact with a beneficiary and enrolling that beneficiary. In April 2024, CMS adopted final rules placing limitations on the compensation of certain distributors of Medicare products and establishing certain contractual standards for dual eligible special needs plans enrollments, among other things. To the extent they are determined to apply to our operations, ***these and any other changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation, or the***

*manner in which they are enforced could harm our business, operating results, financial condition and prospects.*

*In addition, changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods*.

187.    The statements in ¶186 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

(a)    The contingent statement that "***non-compliance*** with or changes in laws and regulations governing the marketing and sale of Medicare plans" "***could***" "harm our business, operating results, financial condition and prospects" implied that SelectQuote was not at the time non-compliant with the laws and regulations governing the marketing and sale of Medicare plans, when in fact the Company was already non-compliant;

(b)    Similarly, the contingent statement that "***changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could*** harm our business, operating results, financial condition and prospects" implied that Defendants were not aware of already existing (or previously existing) conduct that violated then-current laws and regulations; and

(c)    The statements were materially misleading because they failed to disclose both (i) significant materializations of the risks that had already occurred and (ii) concrete facts that materially increased the magnitude and impact of these risks. Specifically, the statements failed to disclose that:

(1)    Between 2016 and at least 2021, SelectQuote received illegal renumerations (a/k/a kickbacks) from insurers in return for commitments to meet specific targets for enrollment of beneficiaries in Medicare Advantage plans in a manner which violated Federal law;

(2)    SelectQuote was therefore already non-complaint with laws and regulations governing the marketing and sale of Medicare plans, including the Anti-Kickback statute and the False Claims Act; and

(3)    As a result of the foregoing, the risk had already materialized in substantial part, as Defendants' conduct had exposed SelectQuote and its officers to civil and criminal liability and severe reputational damage, and therefore the risk to the Company's business, operating results, financial condition and prospects was materially higher than Defendants' statements suggested.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

188.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding SelectQuote, their control over, and/or receipt and/or modification of SelectQuote's allegedly material misstatements and/or their associations with the Company that made them privy to confidential and/or proprietary information concerning SelectQuote, participated in the fraudulent scheme alleged herein.

189.    The Individual Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicit or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

190.    The fraud alleged herein related to the Company's practice of soliciting and receiving monies paid in consideration for enrollments of Medicare Advantage plans and preferential treatment for insurers, in a manner which violated Federal and State law, involved SelectQuote's "core operations," and knowledge of the fraud may therefore be imputed to SelectQuote and the Individual Defendants.

## A.    Scienter As To Funds Received From Humana Specifically

191.    As internal communications cited in the DOJ complaint show, SelectQuote received payments under an artifice of formally contracting for "leads" but negotiating about, and paying for, enrollments, in knowing violation of state and federal law.  Further, as internal communications cited in the DOJ Complaint show, both SelectQuote and its insurer partners knew that the insurers, and Humana specifically, intended their payments to be consideration for enrollments and for preferential treatment.

192.    For example, by early August 2018, Humana and SelectQuote had informally agreed that Humana would pay SelectQuote $5.82 million for the Annual Enrollment Period, and Ms. Kute at Humana asked Bob Grant, then the Chief Revenue Officer at SelectQuote to draft a justification that she could submit internally for this payment.[120]

---

[120]    DOJ Complaint ¶230.

193.    According to Bob Grant's draft justification, "[t]he total spend . . . [is] for an increase in sales in AEP of appx. 13,000 sales bringing the total sales to 25,000 during the AEP timeframe.  This will entail a $232 CPS [cost per sale] during AEP and allow Humana to stay competitive on the platform and will allow SelectQuote to have the exclusive pod with roughly 70 agents."[121]  Thus, Humana paid not merely for a "targeted marketing campaign," as stated in the parties' contract, but for an increase in sales, "to stay competitive on the platform," and for an "exclusive pod."[122]

194.    Bob Grant's draft justification demonstrates that he understood the Humana pod was "exclusive," that the payments were directed to drive consumers to a particular carrier (Humana), and that customers directed to the pod would not be provided with unbiased comparison shopping.

195.    On October 26, 2020, Evan Mohl, Humana's Vice President of Strategy and Sales Channel Development Lead, told his colleagues that Humana used its alleged marketing funding to:

> "maintain[] several [relationships with brokers] that are semi-exclusive or preferential, which has worked to our advantage to ensure **we earn more than our fair share of sales** while driving down CPS [cost per sale]. For example, without SelectQuote exclusive pod of agents, we would not be their No. 1 carrier."[123]

196.    While this communication was internal within Humana, it reflects Humana's understanding that SelectQuote used an exclusive pod of agents to steer beneficiaries to Humana and that without this exclusive pod, Humana would not be SelectQuote's top carrier.  It also reflects

---

[121]    DOJ Complaint ¶231.

[122]    *Ibid.*

[123]    DOJ Complaint ¶248.

Humana's understanding that these preferential practices allowed Humana to "earn more than our fair share of sales."

197.    In another example, in October 2020,  Humana's Sales Vice President Craig Uchytil sent an email to Humana National Sales Manager Megan Kute and others with the following request:

> "I need your help quickly. We need to understand our ability to build a contingency plan for more sales if possible. Please speak to our partners (the productive ones) and ask them if we gave them more money could they drive more Humana sales? What would the new CPS be to get more? How many more could they get?"[124]

Kute responded that "***SelectQuote believes they can do an additional 15,000 sales for Humana over the next 3 quarters ... at a CPS of $250 (incremental sales only)***."[125]  By December 2, 2020, according to Mohl, Humana had decided to pay SelectQuote an additional $6 million in alleged marketing funding, with $4.7 million of that amount to be allocated to sales in the first three quarters of 2021.[126]

198.    In 2021, Humana paid SelectQuote approximately $29.5 million in purported marketing funding.[127] Again, SelectQuote maintained an artifice of formally contracting for "leads" but negotiating about, and paying for, enrollments. For example, on January 13, 2021, Robin Reece, Humana's National Sales Director for External Distribution, told her colleagues that, separate and apart from other agreements in December 2020, Humana had the following understanding with SelectQuote for the first three quarters of the year: "Ql CY21 -47,000 sales

---

[124]    DOJ Complaint ¶249.

[125]    *Ibid.*

[126]    DOJ Complaint ¶250.

[127]    DOJ Complaint ¶251.

($7,050,000)[,] Q2 CY21 -25,250 sales ($3,787,500)[,] Q3 CY21 - 26,250 sales ($3,937,500)." SelectQuote was keenly aware of these enrollment commitments to Humana.[128]

199.    In another example, on July 14, 2021, Kopmeyer, SelectQuote's Senior Vice President of Carrier & Strategic Partnerships, asked a colleague in SelectQuote's finance department to:

> "please create an invoice for us to send to Humana. They do NOT want a timeframe (*I can explain this offline*) but the invoice should be for **$1,860,000** and the number of leads we can generate for this amount of $ - should be roughly 150K for leads."[129]

 Kopmeyer added that "this is for 12,400 submissions .... incremental to our current AEP commitment of 70K."  The written agreement for $1,860,000, effectuated about a month later, made no mention of incremental submissions or enrollments.[130]  SelectQuote's conduct in creating an invoice showing a transfer of "leads" while the true nature of the arrangement was to tie the payments to specific numbers on enrollments shows that SelectQuote understood the payments violated the federal anti-kickback rules.

200.    On September 1, 2021, Humana agreed to pay SelectQuote $10 million, allegedly for "a targeted marketing campaign between October 1, 2021 and December 7, 2021" that would "include the purchase and use of leads."[131]  On top of this agreement, SelectQuote offered Humana the chance to pay larger kickbacks in exchange for more enrollments into Humana's Medicare Advantage plans.  Specifically, on October 20, 2021, Kopmeyer proposed to Kute that "for an

---

[128]    DOJ Complaint ¶252.

[129]    DOJ Complaint ¶253.

[130]    *Ibid*.

[131]    DOJ Complaint ¶254.

investment of $500K we could ***commit*** an incremental ~2,500+ enrollments."[132]  Kopmeyer's use of the term "commit" shows that he understood the arrangement to involve a commitment to specific enrollment numbers.  Following negotiation of these figures, SelectQuote Senior Account Manager, Bourdelais, reported to her colleagues that "Humana is paying us an additional $500,000 in MDF for an additional 3,500 submissions," on top of prior enrollment commitments.[133]

### B.    Scienter As To Funds Received From Aetna Specifically

201.    As internal SelectQuote communications cited in the DOJ Complaint show, both SelectQuote and its insurer partners knew that the insurers, and Aetna specifically, intended their payments to be consideration for enrollments and for preferential treatment.

202.    For example, in 2020, Aetna paid SelectQuote nearly $4.9 million in "Market Development Funding."[134]  When Aetna dropped its payments to $200 per policy for the 2021 Annual Enrollment Period (in the fall of 2020), SelectQuote limited its steering to Aetna plans.  According to an email from SelectQuote's Maurno to Aetna's Matthews on April 6, 2021, "[f]or Tiburon Pod, Aetna was dropped to 'Priority 4' and only paid at 50% commission for this past AEP."  Aetna's market share on the SelectQuote sales platform was just 9.8 percent in the last quarter of 2020, compared to 15.9 percent during the same period a year earlier.[135]

203.    In 2021, Aetna paid SelectQuote approximately $7.4 million in "marketing" money.[136]  SelectQuote received these payments under an artifice of formally contracting for "leads" but negotiating about, and paying for, enrollments, in knowing violation of state and

---

[132]    DOJ Complaint ¶255.

[133]    DOJ Complaint ¶256.

[134]    DOJ Complaint ¶451.

[135]    DOJ Complaint ¶455.

[136]    DOJ Complaint ¶456.

federal law.  For example, on May 11, 2021, Kopmeyer sent Sowell a lengthy email with a veiled threat to reduce sales of Aetna policies if Aetna did not increase its payments to SelectQuote:

> "With Aetna either paying less or not participating in ways that help our LTV s [lifetime values], it currently has the lowest LTV of all of our key carrier partners. Not only that, there are meaningful deltas between Aetna and its competitors. This puts pressure on [SelectQuote] to maintain and grow Aetna's market share; in fact, being financial stewards of the company would drive opposite behavior."[137]

### C.    Corporate Scienter and Respondeat Superior

204.    As alleged herein, the Defendants acted with scienter because they knew that the public documents and statements issued or disseminated in the name of SelectQuote were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

205.    As alleged herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding SelectQuote, their control over, and/or receipt and/or modification of SelectQuote's allegedly materially misleading misstatements and/or their associations with SelectQuote which made them privy to confidential proprietary information concerning SelectQuote, participated in the fraudulent scheme alleged herein.

206.    Each of the Individual Defendants was a high-ranking management-level employee that: (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false or misleading statements alleged herein.  In so doing, each was acting in their role as an executive

---

[137]    DOJ Complaint ¶457.

employee and representative of SelectQuote. The scienter of each of these individuals and all other management-level employees of SelectQuote is therefore imputed to Defendant SelectQuote.

207. The Company is further liable for the acts of the Individual Defendants and other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

208. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior,* and agency principles.

209. Aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to SelectQuote as an entity because, in part, the DOJ complaint relies on internal communications and/or corroborating witness testimony of SelectQuote employees. The following individuals are management-level employees whose knowledge can be imputed to the Company for the purposes of determining corporate scienter.

### 1.    Tom Grant

210. Tom Grant ("T. Grant") served as a member of the SelectQuote board from 2008 to 2025, including as Vice Chairman of the board from 2019 to 2025. T. Grant also served as the President of SelectQuote from 2011 to 2018.

211. The Department of Justice alleges, *inter alia,* that based on internal corporate documents, T. Grant was involved in orchestrating the kickbacks which induced SelectQuote to establish the Tiburon Pod of Humana-exclusive agents. For example, in December 2016, T. Grant, explained to Robin Reece, Humana's National Sales Director for External Distribution, and Humana National Sales Manager Megan Kute, that if SelectQuote had shifted its agents from the

Tiburon pod, where nearly all of their sales were Humana, back to SelectQuote's multi-carrier platform, Humana would have received only about twenty-six percent of those agents' sales.[138]

212.    T. Grant's knowledge and scienter can be imputed to the Company under the corporate scienter doctrine, *respondeat superior,* and agency principles.

### 2.    Joshua Kopmeyer

213.    Joshua Kopmeyer ("Kopmeyer") has been SelectQuote's Chief Revenue Officer since January 2022. Since 2017 Kopmeyer has various leadership positions at SelectQuote, including Senior Vice President of Carrier & Strategic Partnerships and Vice President of Strategic Accounts.

214.    According to the Department of Justice, Kopmeyer was engaged in soliciting, negotiation, and creation of invoices which purported to be contracts for "leads" but were in fact about, and paying for, enrollments.  For example, on July 14, 2021, Kopmeyer, then SelectQuote's Senior Vice President of Carrier & Strategic Partnerships, asked a colleague in SelectQuote's finance department to "please create an invoice for us to send to Humana. They do NOT want a timeframe (I can explain this offline) but the invoice should be for $1,860,000 and the number of leads we can generate for this amount of $ - should be roughly 150K for leads."  Mr. Kopmeyer added that "this is for 12,400 submissions .... incremental to our current AEP commitment of 70K." The written agreement for $1,860,000, effectuated about a month later, made no mention of incremental submissions or enrollments.[139]

215.    Kopmeyer's knowledge and scienter can be imputed to the Company under the corporate scienter doctrine, *respondeat superior,* and agency principles.

---

[138]    DOJ Complaint ¶209.

[139]    DOJ Complaint ¶253.

### 3. Josh Matthews

216. Josh Matthews ("Matthews") has been the President of the Senior Division at SelectQuote since July 2022. Prior to that, he was the Senior Vice President of Sales and Executive Vice President of Medicare Sales Operations from July 2019 to June 2022. Matthews joined SelectQuote in 2014.

217. The Department of Justice alleges, *inter alia,* that based on internal corporate documents, Matthews was involved in orchestrating the kickbacks which induced SelectQuote to steer customers to the plans of paying insurers. For example, in 2019, Matthews told Matthew Feret, then Aetna's Executive Director and Medicare Chief Sales Officer, by text message that SelectQuote "[c]an direct certain traffic to other folks who have the appetite for it."[140] In another example, the DOJ complaint cites that Matthews testified that "there is a cap for the amount of marketing dollars that are available from Humana ... 31,000 [enrollment submission] is the max we want to try to produce for them." He went on to explain under oath how, in return for the marketing money, SelectQuote would then use the Tiburon pod to steer away from Humana and to Aetna:

> "We're globally overproducing means we probably well exceeded the 31,000 .... Each policy that we sell, every lead that we buy that's going towards Humana, is going to have depressed economics. So in this situation it's how do we utilize the pod to try to sell as much Aetna as possible because we wouldn't have depressed economics when we sell an Aetna plan whereas we would with Humana." [141]

218. Matthews' knowledge and scienter can be imputed to the Company under the corporate scienter doctrine, *respondeat superior,* and agency principles.

---

[140]    DOJ Complaint ¶457.

[141]    DOJ Complaint ¶452.

#### 4.      Ron Maurno

219.      Ron Maurno ("Maurno") served as a SelectQuote Director of Medicare Sales from September 2019 to December 2020 and a Senior Director of Sales from January 2021 to September 2021.

220.      According to the Department of Justice, Maurno was engaged with facilitating and steering brokers to sell plans based on the amount of kickbacks paid to the Company.  For example, when Aetna dropped its payments to $200 per policy for the 2021 Annual Enrollment Period, SelectQuote limited its steering to Aetna plans.  According to an email from Maurno to Matthews on April 6, 2021, "[f]or Tiburon Pod, Aetna was dropped to 'Priority 4' and only paid at 50% commission for this past AEP."[142]

221.      Maurno's knowledge and scienter can be imputed to the Company under the corporate scienter doctrine, *respondeat superior,* and agency principles.

#### 5.      Laura Bourdelais

222.      Laura Bourdelais ("Bourdelais") has been SelectQuote's Director of Carrier and Strategic Partnerships since 2023.  Previously she was a SelectQuote Senior Account Manager from July 2020 to 2023.

223.       According to the Department of Justice, Bourdelais, then a Senior Account Manager, was engaged in the negotiation for larger kickbacks in exchange for more enrollments in Medicare Plans, under the guise of marketing funds.  For example, on or about October 20, 2021, Bourdelais, reported to her colleagues that "Humana is paying us an additional $500,000 in MDF for an additional 3,500 submissions," on top of prior enrollment commitments.[143]  This

---

[142]      DOJ Complaint ¶455.

[143]      DOJ Complaint ¶256.

occurred following an exchange where Kopmeyer proposed to Megan Kute, a Humana National Sales Manager, that "for an investment of $500K we could commit an incremental ~2,500+ enrollments." *Ibid*.

224.    Bourdelais's knowledge and scienter can be imputed to the Company under the corporate scienter doctrine, *respondeat superior,* and agency principles.

### D.    Defendants' Access To Information And Core Operations

225.    The Individual Defendants' scienter is also established because the alleged misstatements and omissions at issue here concerned SelectQuote's core operations.  In fiscal year 2020, Senior segment revenue represented 68% of SelectQuote's total revenue;[144] in 2021, that rose to 78%;[145] in 2022 it was 69%;[146] in 2023 it was 59%;[147] in 2024, it was 50%.[148]  The Senior segment was the Company's single largest single contributor to SelectQuote's revenue.  Medicare Advantage and Medicare Supplement plans further represented the majority of the Company's Senior revenue.  For example, in 2020, Medicare Advantage and Medicare Supplement plans accounted for 78% of Senior polices sold,[149] rising year-over-year to 91% in fiscal year 2024.[150] The Company's Senior Segment, and specifically its Medicare sales, were therefore key to the Company's ability to maintain revenue.

226.    The Individual Defendants' scienter is further supported by the fact that members of the Board were directly involved in the Company's Medicare sales operations and implicated

---

[144]    FY20 10-K.

[145]    FY21 10-K.

[146]    FY22 10-K.

[147]    FY23 10-K.

[148]    FY24 10-K.

[149]    FY20 10-K.

[150]    FY24 10-K.

in the DOJ Complaint.  For example, Tom Grant served on the Board from 2008 until July 2025. The DOJ Complaint sets forth that Tom Grant explained to Humana representatives that the function of the Pods to steer sales.[151]  The DOJ Complaint concludes that "[i]n other words, but for the kickbacks that induced SelectQuote to establish the Tiburon pod of Humana-exclusive agents, approximately seventy-four percent of the Tiburon sales would have gone to other carriers."[152]

227.    The Individual Defendants' scienter is further supported by the fact that members of senior management were directly involved in the scheme and were implicated in the DOJ Complaint.  For example, Kopmeyer has been SelectQuote's Chief Revenue Officer since January 2022.  During the Class Period, Kopmeyer was also the Senior Vice President of Carrier & Strategic Partnerships and Vice President of Strategic Accounts.  According to the Department of Justice, Kopmeyer was engaged in soliciting, negotiation, and creation of invoices which purported to be contracts for "leads" but were in fact about, and paying for, enrollments.[153]

## VII.    LOSS CAUSATION

228.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

229.    Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions.  This course of wrongful conduct caused the price of SelectQuote's common stock to be artificially inflated.  But for Defendants' misrepresentations and/or omissions, Plaintiff and the other members of the Class would not have purchased

---

[151]    DOJ Complaint ¶209.

[152]    *Ibid.*

[153]    *See e.g.* DOJ Complaint ¶253.

SelectQuote common stock or would not have purchased such stock at artificially inflated prices. Later, when Defendants' prior misrepresentations and/or omissions were disclosed to the market, and/or when the concealed risks materialized, the price of SelectQuote shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of SelectQuote common stock during the Class Period, Plaintiff and other members of the Class suffered economic losses, i.e., damages, under the Exchange Act. The timing and magnitude of the decline in the prices of the Company's shares negate any inference that the economic losses and damages suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' wrongful conduct.

230. As detailed *supra*, the truth regarding the Company's illegal practices of receiving kickbacks in exchange for unbiased comparison offerings of Medicare Advantage plans was revealed, and/or the concealed risks materialized, on May 1, 2025, at approximately noon eastern standard time. As a direct result of these disclosures, the price of SelectQuote's stock declined significantly, precipitously, thereby damaging investors as the artificial inflation in SelectQuote's stock price was removed.

231. On May 1, 2025, at approximately noon eastern standard time, the DOJ issued a press release announcing that it had filed the DOJ Complaint that day. The DOJ Complaint revealed that "[f]rom 2016 through ***at least*** 2021,"[154] SelectQuote received "tens of millions of dollars"[155] in "illegal kickbacks"[156] from health insurance companies in exchange for steering

---

[154]    DOJ Complaint at 1.

[155]    DOJ Complaint at ¶198.

[156]    DOJ Complaint at ¶110.

Medicare beneficiaries to enroll in the insurers' Medicare Advantage plans.  The DOJ revealed the financial arrangements between SelectQuote and the insurers were falsely or misleadingly reported as "marketing" fees.[157]

232.    The DOJ concluded that SelectQuote made materially false claims by stating it offers "unbiased coverage comparisons" when in fact it "***repeatedly directed Medicare beneficiaries to the plans offered by insurers that paid them the most money, regardless of the quality or suitability of the insurers' plans***."[158]

233.    The DOJ also uncovered a series of incriminating internal communications that, according to the government, demonstrated that the "[d]efendants knew what they were doing was illegal."[159]

234.     On this news, SelectQuote's stock price fell $0.61, or 19.2%, to close at $2.56 per share on May 1, 2025, on unusually heavy trading volume.

## VIII.   CLASS ACTION ALLEGATIONS

235.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired SelectQuote common stock between September 9, 2020 and May 1, 2025, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

---

[157]    DOJ Complaint at ¶¶198; 228; 378-379; 456.

[158]    DOJ Complaint at ¶¶73-74.

[159]    DOJ Complaint at 1.

236.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SelectQuote's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of SelectQuote shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by SelectQuote or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

237.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

238.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

239.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SelectQuote; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

240.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

241.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

242.     The statements and omissions alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SelectQuote who knew that the statement was false when made, and/or the statement lacked a reasonable basis.

X.      **NO SAFE HARBOR**

243.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

244.    The statements and omissions alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SelectQuote who knew that the statement was false when made, and/or the statement lacked a reasonable basis.

XI.     **CLAIMS FOR RELIEF**

**<u>FIRST CLAIM</u>**

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**<u>Against All Defendants</u>**

245.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

246.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SelectQuote's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

247.    Defendants (i) employed devices, schemes, and artifices to defraud; and/or (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for SelectQuote's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Any one of which is sufficient for Plaintiff to state a claim, and Plaintiff expressly alleges violations under all three sections of Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

248.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SelectQuote's financial well-being and prospects, as specified herein.

249.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of SelectQuote's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SelectQuote and its business operations and future prospects in

light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

250.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

251.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SelectQuote's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have

actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

252.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of SelectQuote's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired SelectQuote's common stock during the Class Period at artificially high prices and were damaged thereby.

253.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that SelectQuote was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their SelectQuote common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

254.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

255.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

256.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

257.    Individual Defendants acted as controlling persons of SelectQuote within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

258.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

259.    As set forth above, SelectQuote and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 16, 2026

By:    */s/ Rebecca Dawson*
**GLANCY PRONGAY & MURRAY LLP**
Rebecca Dawson
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com
rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan

Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Counsel for Lead Plaintiff Robert Pahlkotter and
Lead Counsel for the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 16, 2026, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 16, 2026.

*s/ Rebecca Dawson*

Rebecca Dawson